NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11468


COMMONWEALTH  vs.  LEVI OMAR ALCANTARA.



Essex.     February 6, 2015. - June 1, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, & Hines, JJ.



Homicide.  Evidence, Consciousness of guilt, Hearsay, Third-
    party culprit, Relevancy and materiality, Medical record,
    Privileged record, Cross-examination, Impeachment of
    credibility.  Practice, Criminal, Instructions to jury,
    Hearsay, Record, Capital case.  Witness, Cross-examination,
    Credibility.



Indictments found and returned in the Superior Court
Department on June 7, 2006.

The cases were tried before Leila R. Kern, J.


Jeffrey L. Baler for the defendant.
Catherine Langevin Semel, Assistant District Attorney, for
the Commonwealth.


CORDY, J.  On April 22, 2006, Maria Sastre was beaten to

death with a hammer in her home.  When one of her children,

Jesus, attempted to intervene, he, too, was beaten with the

hammer but was able to escape.  Soon thereafter, the defendant,

Levi Omar Alcantara, called the police from a nearby gasoline station claiming that he had also been a victim of the attacks in Maria's home. In contrast, both Jesus and his brother, Christopher, identified the defendant as the assailant. The handle of the hammer tested positive for the defendant's deoxyribonucleic acid (DNA), and red-brown stains on the defendant's clothing were consistent with the DNA of both Maria and Jesus.

The defendant was indicted for murder in the first degree, assault with intent to kill, and assault and battery by means of a dangerous weapon. A jury convicted him of all of the charges, including murder in the first degree by reason of extreme atrocity or cruelty. On appeal, the defendant assigns error to several evidentiary rulings made by the trial judge. We find no reversible error and no basis for exercising our authority under G. L. c. 278, § 33E, to reduce the level of guilt or to order a new trial. Accordingly, we affirm the defendant's convictions.

1. Background. a. The trial. We recite the facts that the jury could have found, reserving certain details for the issues raised on appeal. On April 22, 2006, Jesus awoke to the sound of his mother screaming inside their home on Washington Street in Lawrence. On further investigation, he observed a man beating his mother with a hammer. Another of Maria's children, Christopher, then observed the assailant on top of Jesus,

beating him with the hammer.  Jesus was able to rid the assailant of the hammer, at which point the assailant struck him with a vase.  Jesus wrested himself free and ran from the home.  Christopher then observed the assailant leave the home, jump over a fence, and escape down an alley.

Jesus ran to a neighbor, who placed an emergency 911 telephone call in which she reported that "some guy went inside [her] neighbor's house and he hit a little kid and he's bleeding out of his head . . . screaming to [her] to call the ambulance to help him."  Lawrence police officers responded to the scene and interviewed Jesus, who described the assailant as wearing a blue or white T-shirt and blue or dark jeans.  Jesus and Christopher, who were fourteen and twelve years of age, respectively, at the time of the assault, told the police that they recognized the assailant as the cousin of their mother's former boy friend, Ysidro Santos.[1]  Maria was transported to the hospital, where she was pronounced dead as a result of skull fractures and brain lacerations caused by multiple "chop wounds" of the head that were consistent with blows from a hammer.

Nineteen minutes after the neighbor's 911 call, the defendant placed two 911 calls in which he stated that

---

[1] The defendant was known to refer to persons as his "cousin" regardless of any actual legal relation.  Jesus and Christopher testified that the defendant had previously frequented their home with Santos and, on occasion, without him.

"something happened to [him]"; that he had been at Washington Street; and that he was now at a gasoline station about one-quarter mile away. An officer responded to the gasoline station and found the defendant clad only in boxer shorts, socks, dress shoes, and a torn and stained blue T-shirt; with scratches on his face, forearms, and chest; and with a cut on his right hand. The defendant approached the officer and screamed, "they tried to kill me. They threw me in the car and they tried to kill me, too."

The defendant was transported to the police station for further questioning. The defendant told the police that four Hispanic men entered Maria's home and beat him with a baseball bat and the victim with a hammer. Two of the men then forcibly removed the defendant from the home, placed him in their automobile, removed his clothing, and robbed him. The defendant stated that he subsequently was able to escape from the vehicle, at which point he ran to the gasoline station and placed the 911 calls. When the defendant was being escorted to the police station bathroom -- and, in the process, by an interview room where Christopher was sitting with the door ajar -- Christopher exclaimed: "That's the guy." Christopher and Jesus were subsequently presented with photographic arrays and asked if any of the photographs depicted the assailant. Both Christopher and Jesus selected the defendant's photograph.

A request was made for Santos to submit a DNA sample, but Santos never submitted the sample and the police never followed up with him.  The police did, however, obtain DNA samples from the defendant, Maria, Jesus, and Christopher.  The defendant's DNA was consistent with a profile obtained from a red-brown stain on the handle of the hammer.  The handle also reflected DNA from an unknown person.  There was other DNA evidence implicating the defendant as the hammer-wielding assailant.  For example, a red-brown stain on the defendant's shoe was consistent with Maria's DNA, while a red-brown stain on the defendant's T-shirt was consistent with both Maria's and Jesus's DNA.  The police did not find the remainder of the defendant's clothing, which the Commonwealth attempted to explain by the high water level of a nearby river.[2]

The theory of the defendant's case was misidentification and the failure by the police to conduct an adequate investigation into other plausible suspects, including Santos and the four men mentioned in his statement at the police station.  The defendant highlighted discrepancies between Jesus's and Christopher's descriptions of the assailant, as compared to the clothing the defendant was wearing at the gasoline station and in surveillance footage from a convenience

---

[2] The inference was that the defendant had discarded his clothing into the river.

store shortly before the attack. The defendant also attempted, with varying success, to introduce evidence that Santos was a third-party culprit and that the police should have conducted a more extensive investigation into his alleged role in orchestrating the attack on Maria, Jesus, and, indeed, the defendant.[3]

b. <u>Suppression and admission of the custodial statement</u>. Prior to trial, the defendant filed a motion to suppress the statements he had made at the gasoline station and police station. The motion judge observed that the statement at the gasoline station was not made in response to police questioning and, therefore, was not subject to suppression. In contrast, the judge concluded that the Commonwealth failed to prove that the custodial statement at the police station was voluntary beyond a reasonable doubt. Consequently, the statement made at the police station was suppressed.

At trial, however, the defendant moved to admit the suppressed statement as evidence of a third-party culprit, consciousness of innocence, and the inadequacy of the police investigation. The Commonwealth objected and the judge initially denied the motion, ruling that, even if the defendant

---

[3] A voir dire was held in which a State trooper testified that he interviewed Santos on the day of the attack. Santos confirmed that he was Maria's boy friend, but averred that he was with his parents at the time of the attack.

could waive his constitutional right to the suppression, the statement constituted inadmissible hearsay. The Commonwealth then withdrew its objection to the statement with respect to the adequacy of the police investigation, prompting the judge to admit the statement only for that limited purpose. The judge then instructed the jury that the statement was "permitted to be introduced by the defendant only as it bears on the police investigation of this case. So it should be clear that the Commonwealth had no choice, they were not permitted to introduce this during their case-in-chief."

During the charge conference, the Commonwealth requested a consciousness of guilt instruction referencing several statements that the defendant had made to the police. The defendant objected to the use of the custodial statement for this purpose, as it had only been admitted for the purpose of challenging the police investigation. The judge disagreed, stating to counsel that "once the Commonwealth withdrew its objection to the custodial statements it obviously mooted or made moot that limiting instruction." The judge later instructed the jury:

> "You've heard evidence suggesting that the defendant may have made false statements; that is, he may have intentionally made certain false statements around the time of his arrest. If the Commonwealth has proven the defendant did make those statements, you may consider whether such actions indicate feelings of guilt by the

defendant and whether in turn such feelings of guilt might tend to show actual guilt on these charges."

c. <u>Midtrial hearings</u>. During the trial, a hearing was held to determine the admissibility of a statement by a local convenience store clerk that there was "hearsay in the neighborhood" that Santos had stated that Maria "deserved what she got." In addition, a voir dire hearing was conducted to determine whether the statements of Maria's daughter, Chabley, and the godfather of Maria's children could be introduced through the testimony of two State police officers as evidence of a third-party culprit or inadequate police investigation. Trooper Brian O'Neil testified that the neighbor gave him a handwritten statement stating that Chabley had told the neighbor that "her mother's boyfriend had threatened the mother. He told her to watch her back, that one of these days something bad was going to happen to her." Lieutenant James Dowling testified that the godfather told him that Chabley had said "that [Y]sidro Santos stated that he was going to have her mother killed because she did not want to be with him anymore." Although, at first, the godfather told Lieutenant Dowling that Chabley told him this directly, the godfather later stated that he had heard it from another person who had heard it from Chabley. The judge concluded that each of these statements was unreliable and, thus, inadmissible at trial.

2.  Discussion.  a.  Consciousness of guilt instruction.
The defendant contends that the judge erred in allowing his
custodial statement to be considered as evidence of
consciousness of guilt, where the judge previously instructed
the jury that the statement was only admissible insofar as it
reflected on the adequacy of the police investigation.  See
generally Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980).
Because his challenge to the instruction was preserved at trial,
we review the claim for prejudicial error.  Commonwealth
v. Burgos, 462 Mass. 53, 67, cert. denied, 133 S. Ct. 796
(2012).

"A consciousness of guilt instruction is permissible where
'there is an inference of guilt that may be drawn from evidence
of flight, concealment, or similar acts, such as false
statements to the police, destruction or concealment of
evidence, or bribing or threatening a witness.'"  Id.,
quoting Commonwealth v. Stuckich, 450 Mass. 449, 453 (2008).
"False statements to police may be considered as consciousness
of guilt if there is other evidence tending to prove the falsity
of the statements."  Commonwealth v. Robles, 423 Mass. 62, 71
(1996).  Such statements are not ensnared by the rule against
hearsay because they are offered not for their truth, but for
the proposition that the defendant's "version of events was

intended to be a lie." Commonwealth v. Caillot, 454 Mass. 245, 256 (2009), cert. denied, 559 U.S. 948 (2010).

Here, the Commonwealth presented evidence, apart from the defendant's custodial statement, warranting a consciousness of guilt instruction. The defendant's statements at the gasoline station and during the 911 calls portrayed a version of events in stark contrast to the testimony of the victim's children. According to the defendant, the perpetrators kidnapped him and attempted to kill him. According to Jesus and Christopher, however, the defendant was the perpetrator. If the jury accepted the children's version of the events, then the defendant's statements reflected an attempt to lie to the police about his role in the killing and assault. See id. Consequently, it was not error for the judge to instruct the jury that they could consider the defendant's statements as evidence of consciousness of guilt if the Commonwealth proved that the statements were false. See Commonwealth v. Martin, 467 Mass. 291, 308-309 (2014) (erroneous admission of cumulative consciousness of guilt evidence not prejudicial error).

Nonetheless, as the Commonwealth concedes, the judge's ruling that the consciousness of guilt instruction could also encompass the defendant's custodial statement was inconsistent with her prior ruling and instruction limiting that statement's use to the adequacy of the police investigation. The

prosecutor's discussion of consciousness of guilt during closing argument, however, was focused on the defendant's missing clothing, his 911 calls, and his statement at the gasoline station. In contrast, the prosecutor's use of the defendant's custodial statement in her closing focused the jury specifically on the reasonableness of the police response to the information the defendant had provided.[4] See Commonwealth v. Rivera, 425 Mass. 633, 643 (1997) (prosecutor's closing argument did not guide jury to prohibited inference).[5]

Moreover, the judge did not share with the jury her ruling that the statement was available to be used for consciousness of guilt purposes, nor, in her final instructions, did she explicitly invite the jury to draw a connection between the custodial statement and consciousness of guilt. Although the better practice would have been for the judge to have reminded the jury that they could consider that statement only as

---

[4] The prosecutor posed to the jury, "So the police, what do the police do. . . . The police interview the defendant. And he makes a number of statements to them. And you can consider, I think when you consider the police investigation in this case, whether they made any sense. They had spoken to Jesus Mandes, and they had spoken to Christopher Mandes. They had that information. . . . His story simply didn't make sense, and the police, I would suggest, understood that."

[5] In his closing argument, defense counsel contended that the defendant's willingness to speak to the police at the police station, "after they tell him, look, you have a right [not to say anything]," and "a right to a lawyer," was consistent with his innocence.

evidence of the adequacy of the police investigation, "[w]e presume that a jury follow all instructions given to it." Commonwealth v. Watkins, 425 Mass. 830, 840 (1997). As far as the jury knew, the prior limiting instruction remained in effect and the custodial statement was not part of the Commonwealth's case. Thus, to the extent the judge's ruling on consciousness of guilt constituted error,[6] the error "did not

---

[6] At trial, the defendant argued that he was entitled to use the suppressed statement as a shield, but that the Commonwealth remained constitutionally precluded from using the statement as a sword against him. Although the judge appeared to accept this argument initially, we are not aware of any direct support for it in the case law. As one commentator has explained:

"By introducing evidence obtained illegally, the defendants should also waive their rights to exclude other evidence obtained in the same unlawful search, seizure, or interrogation as that which yielded the evidence they introduce. It does not advance the goal of protecting affected defendants from the consequences of those constitutional violations if they are not so much objecting to the violation of their rights as trying to take strategic advantage of it with evidence they would not otherwise have. While they undoubtedly would prefer to take advantage of suppression to use any exculpatory proof gathered illegally while excluding the inculpatory proof, there is no justification for allowing them to do so. . . . A defendant insisting in good faith on protection from the consequences of authorities' illegality is hard pressed to claim that he is entitled to exploit those consequences selectively. . . ."

Kainen, Shields, Swords, and Fulfilling the Exclusionary Rule's Deterrent Function, 50 Am. Crim. L. Rev. 59, 92 (2013). These principles have found general application both in the Commonwealth and in other jurisdictions. See, e.g., Commonwealth v. Redmond, 357 Mass. 333, 341 (1970) (in insisting his attorney question witness concerning certain events, defendant "lost the benefit of the earlier order suppressing

influence the jury, or had but very slight

effect."  Commonwealth v. Bresilla, 470 Mass. 422, 440 (2015),

quoting Commonwealth v. Gambora, 457 Mass. 715, 729 (2010).

     b.  Admission of the neighbor's 911 call.  The neighbor's

911 call, in which she stated that "some guy went inside [her]

---

evidence"); United States v. Pierson, 101 F.3d 545, 546 (8th
Cir. 1996), cert. denied, 520 U.S. 1202 (1997) (defendant opened
door to government's use of inculpatory statement previously
suppressed on Miranda grounds); Pettijohn v. Hall, 599 F.2d 476,
481 (1st Cir.), cert. denied, 444 U.S. 946 (1979) ("Once a
defendant attempts to introduce testimony that is intimately
interrelated with previously suppressed testimony, the defendant
waives his objections to the introduction of that related
evidence"); State v. James, 144 N.J. 538, 562-563 (1996)
(defendant may not selectively introduce suppressed evidence
without allowing government opportunity to place evidence in
proper context).

     Yet, there is a tension in applying these principles to a
defendant's use of statements already deemed involuntary.  On
one hand, involuntary statements are considered unreliable and
incompetent evidence, repugnant to due process and inadmissible
for any purpose at trial.  Commonwealth v. Durand, 457 Mass.
574, 591-592 & n.22 (2010).  On the other hand, prior to the
voluntariness determination, a defendant may waive the issue by
using the purportedly involuntary statements, thereby opening
the door to their use by the Commonwealth.  Commonwealth v.
Williams, 379 Mass. 600, 604-605 (1980).  Assuming without
deciding that the defendant was properly allowed to waive
voluntariness altogether and introduce the statement after
prevailing on his motion to suppress, it was not constitutional
error to allow the Commonwealth to respond by arguing that the
statement was false.  See id. at 606 ("When a defendant, acting
through competent counsel, puts particular evidence in issue, he
may not effectively argue on appeal that his own trial strategy
denied him his constitutional rights"); Commonwealth v.
Pettijohn, 373 Mass. 26, 31 (1977) ("We assume without deciding
that the defendant is correct in his premise that, having
prevailed on the motion to suppress . . . the defendant was
privileged to make a timely waiver of his rights as to the
entire suppression issue").

neighbor's house and he hit a little kid," was admitted in evidence over the defendant's objection.  The defendant conceded that the majority of the statement was admissible as an excited utterance, see Mass. G. Evid. § 803(2) (2014), but that the words "some guy" constituted inadmissible hearsay because they were not based on the neighbor's personal knowledge.  The defendant renews this argument on appeal, contending that its admission improperly undermined his narrative of four men entering the house to commit the killing.  We review for prejudicial error.   Commonwealth v. Middlemiss, 465 Mass. 627, 631 (2013).

"The broad rule on hearsay evidence interdicts the admission of a statement made out of court which is offered to prove the truth of what it asserted."  Commonwealth v. DelValle, 351 Mass. 489, 491 (1966), S.C., 353 Mass. 684 (1968).  However, a statement is admissible as an excited utterance, "if (1) there is an occurrence or event 'sufficiently startling to render inoperative the normal reflective thought processes of the observer,' and (2) if the declarant's statement was a 'spontaneous reaction to the occurrence or event and not the result of reflective thought.'"  Commonwealth v. Santiago, 437 Mass. 620, 623 (2002), quoting 2 McCormick, Evidence § 272, at 204 (5th ed. 1999).  "Generally, evidence based on a chain of statements is admissible only if each out-of-court assertion

falls within an exception to the hearsay rule." Commonwealth v. McDonough, 400 Mass. 639, 643 n.8 (1987).

Here, the neighbor's statement made on the 911 call in the presence of the bleeding and screaming child was clearly admissible as an excited utterance. See Middlemiss, 465 Mass. at 631 & n.4 (victim's 911 call seeking assistance admissible as excited utterance); Commonwealth v. Harbin, 435 Mass. 654, 657 (2002) (bystander declaration admissible as excited utterance). However, the neighbor did not observe "some guy" strike Jesus. As such, that portion of the statement constituted totem pole hearsay requiring its own exception to the hearsay rule. See McDonough, supra. See also Commonwealth v. King, 436 Mass. 252, 255 (2002) ("declarant must have personal knowledge of the event in question"). At the hearing on this issue, defense counsel contended that it was Jesus who relayed this information to the neighbor.[7] The judge replied aptly that the statement of a child "who is standing in front of [the neighbor] bleeding from his head" is likewise encompassed by the excited utterance

---

[7] Although the defendant now argues that the identity of the third-party declarant is unknown, the evidence supports the position taken at trial. During the 911 call, the neighbor asked, "What guy?" to a person in her presence. In light of the fact that the neighbor also described Jesus as presently bleeding from his head and screaming to her for help, it is at least a reasonable inference that her question was in response to his statement that a "guy" had struck him. Indeed, the defendant used this to his advantage during closing argument by pointing out that Jesus was unable to answer the neighbor's question.

exception.  See Commonwealth v. Snell, 428 Mass. 766, 777, cert. denied, 527 U.S. 1010 (1999) (victim's statements to neighbor immediately after defendant tried to kill her admissible as excited utterance).  There was no error.  See King, supra at 257 (judge has broad discretion to determine whether prerequisites for excited utterance have been met).

c.  Exclusion of third-party culprit evidence.  The defendant contends that the judge erred in preventing him from introducing the testimony of Trooper O'Neil, Lieutenant Dowling, and the convenience store clerk, as well as the defendant's own statement at the police station, as third-party culprit evidence.  We disagree.

"A defendant has a constitutional right to present evidence that another may have committed the crime."  Commonwealth v. Conkey, 443 Mass. 60, 66 (2004), S.C., 452 Mass. 1022 (2008).  Consequently, we afford "wide latitude" to such evidence, Commonwealth v. Silva-Santiago, 453 Mass. 782, 800 (2009), insofar as it tends to show that another person "had the motive, intent, or opportunity to commit it."  Id., quoting Commonwealth v. Lawrence, 404 Mass. 378, 387 (1989).  However, "because the evidence is offered for the truth of the matter asserted -- that a third party is the true culprit -- we have permitted hearsay evidence that does not fall within a hearsay exception only if, in the judge's discretion, 'the

evidence is otherwise relevant, will not tend to prejudice or confuse the jury, and there are other "substantial connecting links" to the crime.'"  Silva-Santiago, supra at 801, quoting Commonwealth v. Rice, 441 Mass. 291, 305 (2004). Moreover, "the evidence, even if it is not hearsay, 'must have a rational tendency to prove the issue the defense raises, and the evidence cannot be too remote or speculative.'"  Silva-Santiago, supra, quoting Commonwealth v. Rosa, 422 Mass. 18, 22 (1996).

Here, defense counsel essentially conceded that the store clerk's testimony repeated an unsubstantiated rumor lacking in evidentiary value.  See Commonwealth v. Bizanowicz, 459 Mass. 400, 418-419 (2011) (defendant not entitled to base third-party culprit defense on rumor).  With respect to Trooper O'Neil's testimony, the judge observed that there was no evidence as to when Santos made the alleged statements to Chabley. See Commonwealth v. Hunter, 426 Mass. 715, 716-717 (1998), quoting Commonwealth v. Keizer, 377 Mass. 264, 267 (1979) ("acts of the other person [must be] so closely connected in point of time and method of operation as to cast doubt upon the identification of [the] defendant as the person who committed the crime").  With respect to Lieutenant Dowling's testimony, the judge concluded that Loriano's statement was unreliable because of the variations and multiple levels of hearsay.

See Commonwealth v. Cassidy, 470 Mass. 201, 216 (2014) (layered hearsay with uncertain sources unreliable and inadmissible as third-party culprit evidence). See also Commonwealth v. O'Brien, 432 Mass. 578, 589 (2000) ("testimony would have no tendency to prove that [a third party] was actually the murderer, and would be confusing as no more than an opinion of [the third party's] involvement"). The defendant's constitutional rights were not violated by the exclusion of the various hearsay statements implicating Santos.

It was likewise proper for the judge to exclude the defendant's custodial statement as third-party culprit evidence. The "substantial connecting links" between Santos and the killing were clearly lacking in this case, where the only admissible evidence of motive or intent was that Santos and Maria had recently ended their relationship. See Commonwealth v. Wright, 469 Mass. 447, 466 (2014) (evidence of former boy friend's ill will or possible motive insufficient to support third-party culprit defense). Moreover, the only evidence supporting the defendant's version of the events involving the four unidentified assailants was his own self-serving statement. See Williamson v. United States, 512 U.S. 594, 600 (1994) ("Self-exculpatory statements are exactly the ones which people are most likely to make even when they are false"). Although it is possible that the police would have discovered additional

evidence had they conducted a more thorough investigation, their failure to do so was admissible for Bowden, rather than third-party culprit, purposes.  Silva-Santiago, 453 Mass. at 802-803. The judge was within her discretion to so limit the defendant's use of that statement to the adequacy of the police investigation.[8]  See id. at 801 ("admission of feeble third-party culprit evidence poses a risk of unfair prejudice to the Commonwealth").

d.  Exclusion of evidence undermining police investigation. The defendant next argues that the judge abused her discretion in failing to allow the defendant to introduce evidence of an inadequate police investigation.  The defendant assigns error to the exclusion of the following:  (i) the exclusion of the defendant as a source of the DNA found in Maria's vaginal cells; (ii) the presence of illegal drugs in Maria's body revealed

---

[8] Moreover, the defendant was not precluded from presenting a third-party culprit defense to the jury.  The jury heard evidence, which defense counsel reinforced in closing argument, that there was deoxyribonucleic acid (DNA) of an unknown person on the hammer; that there was hair from an unknown person found in Maria's fingernail scrapings; that Santos and Maria had recently ended their relationship; that Maria's blood was not found on the defendant's hands; that the defendant purported to be a victim of the attacks in his 911 calls and gasoline station statement; and that Jesus's and Christopher's descriptions of the assailant's clothing were inconsistent with the clothing the defendant was depicted wearing in surveillance footage recorded shortly before the killing.  See Commonwealth v. Bizanowicz, 459 Mass. 400, 419 (2011) ("Nor did the judge's exclusion of these statements deprive the defendant of the ability to present a defense suggesting that [the third party] was the killer").

during her autopsy; and (iii) the testimony of Trooper O'Neil and Lieutenant Dowling that Chabley said that Santos made threatening statements about Maria. These claims are without merit.

"Defendants have the right to base their defense on the failure of police adequately to investigate a murder in order to raise the issue of reasonable doubt as to the defendant's guilt in the minds of the jury." Commonwealth v. Phinney, 446 Mass. 155, 165-166 (2006), S.C., 448 Mass. 621 (2007). "[T]he inference that may be drawn from an inadequate police investigation is that the evidence at trial may be inadequate or unreliable because the police failed to conduct the scientific tests or to pursue leads that a reasonable police investigation would have conducted or investigated, and these tests or investigation reasonably may have led to significant evidence of the defendant's guilt or innocence." Silva-Santiago, 453 Mass. at 801. This generally is referred to as the Bowden defense. See generally Bowden, 379 Mass. at 486. Where, as here, the defendant asserts a Bowden defense, the trial judge must determine "whether the probative weight of the Bowden evidence exceed[s] the risk of unfair prejudice to the Commonwealth from diverting the jury's attention to collateral matters." Silva-Santiago, supra at 803. "[T]he exclusion of evidence of a Bowden defense is not constitutional in nature and therefore

is examined under an abuse of discretion standard."  Id. at 804 n.26.

Here, the judge held hearings to determine the admissibility of the proposed Bowden evidence.  The sperm and drug evidence was lacking in probative value.  There was no indication that Maria, who was found fully clothed, was engaged in sexual intercourse around the time of the attack, nor was there any evidence whatsoever suggesting that the killing arose from a sexual relationship.  The judge did not abuse her discretion in ruling that the proposed evidence was likely to confuse the jury.  Cf. Commonwealth v. Nesbitt, 452 Mass. 236, 254 (2008) ("for inconclusive DNA evidence to be admissible, it must be probative of an issue of consequence in the case").  Similarly, the judge did not abuse her discretion in ruling that the drug evidence was not probative of police thoroughness, where there was no indication that the drugs or supplier of the drugs played any role in causing Maria's death. Cf. Commonwealth v. Reynolds, 429 Mass. 388, 401 (1999) ("bare statement that [a third party] and the victim dealt drugs together lacks probative quality and would merely mislead the jury").

Moreover, as previously stated, it was within the judge's discretion to exclude the unreliable evidence of Santos's threats.  The defendant may not bootstrap that unreliable

evidence into a claim that the police haphazardly failed to confirm Santos's alibi, where the police had two eyewitnesses -- each of whom knew both the defendant and Santos -- who identified the defendant as the only assailant.  As in Commonwealth v. Wood, 469 Mass. 266, 278 (2014), where the only reliable evidence implicating a third party in the killing was a deteriorated relationship with the victim, the judge properly excluded the evidence as more prejudicial than probative.

In any event, the defendant "was permitted to challenge the adequacy of the investigation as a whole," id., including the failure of the police to follow up with Santos for testing in connection with the unidentified DNA on the hammer and in Maria's finger nail scrapings.  See note 8, supra.  The jury were also allowed to hear the defendant's custodial statement, in which he described the four men that he alleged committed the killing and assaults.  During closing argument, defense counsel vigorously argued these points, as well as the inconsistencies between the eyewitness descriptions of the assailant and the clothing the defendant was observed wearing prior to and following the killing.  "Thus, where the issue of an inadequate investigation was fairly before the jury, the defendant suffered no prejudice from the exclusion of the proffered evidence."  Wood, supra.

     e.   Access to Christopher's treatment records.   During

empanelment, the Commonwealth became aware that one of its

witnesses, Christopher, had been committed to a psychiatric

hospital in Florida on more than one occasion following the

killing.[9]   The Commonwealth informed the defendant, prompting him

to seek discovery of the treatment records on grounds that the

information contained therein might reflect an impaired ability

to recall the events in question.   The judge denied the motion,

ruling that the mere fact of subsequent psychiatric assistance

does not, by itself, constitute the necessary evidentiary

showing to allow a defendant access to a witness's treatment

records.[10]

     On appeal, the defendant appears to argue that showing a

potential for uncovering relevant information is sufficient to

compel access to statutorily privileged treatment records.   That

---

     [9] Christopher was committed to psychiatric care pursuant to
a Florida law allowing for the hospitalization of an individual
at the request of a mental health professional, judge, or law
enforcement official, if believed that the person suffers from a
mental illness and poses a significant risk of harm to either
himself or herself or other people.

     [10] In denying the defendant's motion, the trial judge noted
that the evidence could become admissible if the Commonwealth
opened the door by suggesting that Christopher's condition was
triggered by the traumatic experience of finding his mother
beaten to death and his brother badly injured.   During the
hearing, the Commonwealth indicated that it had no intention of
doing so.

is not the law.  A party seeking to access statutorily privileged treatment records must:

> "establish good cause, satisfied by a showing '(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."'"

Commonwealth v. Sealy, 467 Mass. 617, 627 (2014), quoting Commonwealth v. Lampron, 441 Mass. 265, 269 (2004).

Relevance is merely one factor in the analysis, and it is not established by rank speculation.[11]  See Sealy, supra at 628. Compare Commonwealth v. Bourgeois, 68 Mass. App. Ct. 433, 437 (2007) ("broad claims concerning the victim's lack of credibility as a result of mental health problems are entirely speculative and lack the specificity and reasonableness required"), with Commonwealth v. Labroad, 466 Mass. 1037, 1039 (2014) ("Unlike in Bourgeois, [supra,] the defendant in this case alleged, with particularity, that the [victim's]

---

[11] For example, one might speculate that a child who finds his mother beaten to death with a hammer would be prompted to seek psychiatric assistance as a result.  Cf. Commonwealth v. Bourgeois, 68 Mass. App. Ct. 433, 438 (2007) ("references to various psychiatric and other problems the victim appeared to be experiencing all occurred at or about the time she revealed the abuse and reasonably could be viewed as a consequence of the defendant's abuse").  Yet, it is unclear, absent some further showing, how this would be relevant to the witness's capacity to perceive or recall the underlying event.

psychological records contained specific information regarding her complaint of sexual assault").  Moreover, the defendant does not even offer an argument on appeal as to the remaining factors germane to the analysis.  See Lampron, supra.  In consequence, we cannot say that the judge erred in denying the defendant access to Christopher's treatment records.

f.  Limitation on cross-examination of Christopher.  During the defendant's cross-examination of Christopher, the defendant sought to impeach the witness's credibility by inquiring into his use of prescription antipsychotic drugs around the time of the incident.  Notwithstanding the fact that he was unsure whether Christopher was actually taking such drugs at the time of the incident, defense counsel argued that the subject was fodder for cross-examination because drug use could adversely affect Christopher's ability to perceive or recall the events in question.  The judge found no evidence countermanding the clear recall exhibited by Christopher and, as a result, barred defense counsel from exploring the witness's drug use on cross-examination.  The defendant assigns error to this ruling.  We are not persuaded.

A witness may "be impeached by evidence challenging his testimonial facilities (e.g., ability to perceive the events or remember them accurately)."  Commonwealth v. Daley, 439 Mass. 558, 564 (2003).  "While defendants are entitled to reasonable

latitude on cross-examination, the scope of such cross-examination, including the extent of impeachment of a witness for credibility and competency, are well within the judge's sound discretion." Commonwealth v. Carrion, 407 Mass. 263, 273 (1990). Evidence of a witness's use of legal or illegal drugs is admissible on cross-examination if it would demonstrate an impaired ability by the witness "to perceive and to remember correctly." Id. at 273-274. However, the party seeking admission of such evidence must show a connection between the drug use and the witness's ability to perceive, remember, or testify to the event in question. Commonwealth v. Caine, 366 Mass. 366, 369 (1974).

In the present case, the defendant did not introduce any evidence that Christopher was on psychiatric medication at the time of the incident other than an averment that the defendant believed it to be so. Even if Christopher had been prescribed psychiatric medication at or around the time of the incident, there was no evidence to show that it would have impaired his ability to perceive or recall the incident. Thus, the defendant failed to establish the requisite nexus between Christopher's alleged antipsychotic medication use and any possible impairment. See Commonwealth v. Arce, 426 Mass. 601, 604 (1998) ("evidence of the use of drugs is not alone sufficient to show that drug usage adversely affected [a witness's] perception and

memory").  See also Caine, supra at 370 (mere fact that witness was committed to State hospital insufficient to compel testimony regarding alleged habitual intoxication and drug addiction). The trial judge did not abuse her discretion in limiting the defendant's cross-examination on this point.

g.  General Laws c. 278, § 33E.  We have reviewed the record in accordance with G. L. c. 278, § 33E, and have found no basis to set aside or reduce the verdict of murder in the first degree or to order a new trial.

Judgments affirmed.