NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11502


COMMONWEALTH  vs.  WILLIAM DUNN.



Norfolk.     May 5, 2017. - October 12, 2017.

Present:  Gants, C.J., Lenk, Hines, Gaziano, & Cypher, JJ.[1]


Homicide.  Armed Assault with Intent to Murder.  Insanity.
    Evidence, Insanity, Expert opinion, Credibility of witness.
    Witness, Expert, Credibility.  Practice, Criminal, Capital
    case, Mistrial, Verdict, Instructions to jury.



    Indictments found and returned in the Superior Court
Department on January 15, 2008.

    The cases were tried before Kenneth J. Fishman, J.


    Alan Jay Black for the defendant.
    Tracey A. Cusick, Assistant District Attorney, for the
Commonwealth.


    GANTS, C.J.  On November 2, 2007, the defendant struck

Robert Moore multiple times with a baseball bat in the basement

of Moore's home, killing him, and then attacked his daughter-in-

law, Nancy Moore, with the baseball bat and a shod foot when she

_____

    [1] Justice Hines participated in the deliberation on this
case prior to her retirement.

went downstairs to look for him, nearly killing her.  A Superior Court jury convicted the defendant of murder in the first degree on the theory of extreme atrocity or cruelty for his killing of Robert,[2] and of various indictments for his brutal attack of Nancy, including armed assault with the intent to murder.[3]  The issue at trial was not whether the defendant committed these acts; his attorney admitted that he did so in his opening statement.  The issue was whether the Commonwealth proved beyond a reasonable doubt that he was criminally responsible for his actions.

The defendant presents five claims on appeal:  (1) that the trial judge abused his discretion in denying a motion for a mistrial after the Commonwealth's expert witness commented on the credibility of the defendant or the defendant's expert witness; (2) that the conviction of armed assault with the intent to murder should be reduced to assault with the intent to murder because that is how the verdict slip characterized the indictment; (3) that the judge's instruction to the jury describing what would happen if the jury found the defendant not guilty by reason of lack of criminal responsibility created a

---

[2] We refer to each member of the Moore family by his or her first name to avoid confusion.

[3] The defendant also was found guilty on indictments charging mayhem, assault with intent to maim, assault and battery with a dangerous weapon, and assault and battery causing serious bodily injury.

substantial likelihood of a miscarriage of justice; (4) that the absence of a jury instruction regarding the effects of drugs on the defendant's criminal responsibility created a substantial likelihood of a miscarriage of justice; and (5) that we should exercise our authority under G. L. c. 278, § 33E, to grant the defendant a new trial or reduce his conviction of murder in the first degree to murder in the second degree or manslaughter because the verdict was not consonant with justice. We affirm the defendant's convictions and conclude that the defendant is not entitled to relief under G. L. c. 278, § 33E.

Background. Because the defendant contends that the murder verdict was not consonant with justice, we describe the evidence at trial in some detail, focusing on the evidence regarding the defendant's criminal responsibility.

1. Evidence of the crime. The defendant worked as a foreman at a small irrigation company that installs landscape irrigation systems for homes and small commercial properties. As foreman, his job was to design the irrigation system to be installed at the customer's property and to install it. On the morning of the events at issue, the defendant was the foreman for the installation of an irrigation system at Robert's home in Needham. The defendant arrived early to design the installation and later was joined by a fellow employee, Steven Erickson, who assisted the defendant with the installation, which involved

laying the piping for the system and installing heads, valves, a control clock, and a timer. When Erickson arrived, driving the company's truck, the defendant was planting fluorescent flags in the backyard to "stake out" the irrigation system. Erickson testified that there was nothing unusual about his conversation with the defendant that morning. When the defendant and Erickson took a break, Robert came to the back yard to bring them cookies and milk. Moore's grandson, James, was also there, painting the side of the house.

Around mid-morning, Michael White, the coowner of the irrigation company, came to the site to check on the progress of the installation. The defendant and Erickson had completed about eighty per cent of the job by the time White arrived. White testified that the defendant "appeared fine" and was not acting bizarrely or unusually. White also said that Robert was joking with the men about how he should have just painted his lawn green. White did not stay long and left sometime between 11 and 11:30 A.M.

One of the final remaining tasks was the installation of the irrigation system's control clock and timer inside the home. Erickson usually installed the device, but on this occasion the defendant wanted to perform the job. Robert opened the bulkhead door to the cellar so that the defendant could enter the home and install the control clock and timer. The installation

usually took around fifteen minutes, but Erickson noted that it seemed to be taking the defendant "quite a while" to install the control clock, so he knocked on the bulkhead door.  The defendant answered but did not open the door.

At 11:23 A.M., Robert telephoned his son from his home number in the kitchen and asked for the name of the "head guy" of the irrigation company.  Robert's son had recommended the company to his father, but he could not recall the name of the owner when speaking with his father that morning.  A person speaking from the kitchen on the first floor could be heard by a person in the basement, but there was no evidence confirming that the defendant heard what Robert had said in this telephone call.  A digital forensics State police officer testified that between 11:30 and 11:45 A.M., Robert's computer was used to perform search inquiries for different irrigation and lawn care Web sites.[4]

At around noon, Erickson asked James to open the bulkhead door to see why the defendant was taking so long to install the control clock and timer.  James jogged through the house and into the cellar, where he passed the defendant, unlocked the

---

[4] The defendant's close friend, Sean Clancy, did some work as a subcontractor for the irrigation company that employed the defendant.  In the spring or fall of 2007, the defendant was very angry that Clancy had spoken directly with Michael White, one of the coowners, rather than use the defendant as the intermediary.  Clancy testified that the defendant "just did not want me to talk to Mike White."

bulkhead door, and continued outside; James did not see any blood in the cellar. The defendant followed James outside. James described the defendant as "kind of irritated or agitated" after he came out of the cellar. The defendant twice walked directly under the ladder James was working on, and asked, "Where is the old man?" James replied that he did not know.

Erickson said the defendant "looked normal" when he emerged from the cellar, but that he was "definitely sweating" and was "shoving rubber gloves down his pants"; the installation of the control clock and timer did not require the wearing of gloves. Erickson asked the defendant what he wanted for lunch, and Erickson left to travel to Dedham to purchase lunch.

Nancy, James's mother, arrived at the home at around 12:30 P.M. She asked James whether he had seen his grandfather, and he said, "No." Nancy looked through the home and noticed that the basement door was open. She walked down the stairs to the cellar and saw the defendant, who asked her if he could use the bathroom. When she turned to go back up the stairs to show him one, the defendant grabbed her with an arm around her neck and started punching her continuously in the head. Nancy "tried to fight" and remembered "twisting around and just trying to fight, and . . . yelling." The last thing she remembered before losing consciousness was seeing the defendant "stomping on [her] face."

James finished painting, put away his supplies, and went into the home to wash up. While he was washing his hands, he heard a moaning sound coming from the basement. When he reached the bottom of the stairs, he saw his mother lying face down, near a "bloody baseball bat," with so much blood in her hair and face that he did not recognize her. He then saw his grandfather on the floor in the utility room of the basement, with a large open gash in his skull, lying in a pool of blood; a mop was in the pool of blood. James, fearing for his life, grabbed the baseball bat, ran out of the house, and asked two women walking on the street to "call 911." The defendant was standing in front of the house and asked James, "What do you want to call 911 for? We didn't do nothing." The defendant "took off" as James tried to speak to the two women who were telephoning 911. One of the two women described the defendant's appearance as "very, very red and sweaty"; the other testified that the defendant looked "really dazed and confused." Both of the women said that, after the defendant looked toward them, he ran away from the house, and they did not see him again.

The State police canine unit responded to the emergency call at approximately 1 P.M., and quickly launched a search of the surrounding area. At approximately 3:45 P.M., while searching through a marshy area near Route 128 and the commuter railroad, a State trooper came upon the defendant, who was

"[lying] in a depression in the ground" and had "pulled vegetation over himself so that he was partially obscured from view." The defendant stood up as the trooper approached and, ignoring the trooper's commands, began to struggle with the canine, who had bitten him on the arm. The defendant soon surrendered and was placed under arrest.

As the defendant was being transported to the police station, helicopters hovered above, and the defendant asked, "Is this all over the news?" A different officer testified that he overheard the defendant telling his wife on the telephone at the police station, "I'm in a heap of trouble here. This is important."

At the police station, the defendant waived his Miranda rights and agreed to speak with the police in a video-recorded interview. He told the police that he "just blacked out," and had no recollection of the incident, or of entering or leaving the house.

Nancy's injuries were severe. She suffered a subgaleal hematoma and a "blowout fracture" to the orbital bone around her right eye. According to the radiologist who treated her, these injuries were consistent with being stomped in the face or struck by a bat. Weeks after the attack, Nancy suffered an acute stroke related to her injuries. At the time of trial, she

continued to suffer memory loss and paralysis on the side of her face.

A medical examiner concluded that Robert died as a result of blunt force trauma to the head, consistent with being struck by a blunt object; the pathologist said she had never seen such injuries caused by hands alone. Robert also suffered several broken ribs as well as bruising and abrasions on his arms and legs. The pathologist opined that Robert did not suffer an "instant death," and that "the actual physiologic cause" of death was "just a culmination of all the trauma that his head received."

There was compelling evidence that the defendant had tried to clean the cellar after killing Robert. A sweatshirt, paper towels with red-brown stains, and Robert's eyeglasses were found in a cardboard box in the basement. Two mops with red-brown stains were near his body. Testing that could reveal the presence of blood stains that cannot be seen by the human eye showed "transfer stains" on the floor and in the sink, indicating that blood had once been on those surfaces and that efforts had been made to remove them by cleaning. The defendant apparently had cleaned up the blood on the floor so well that James did not see any blood when he jogged past to open the bulkhead door. One rubber glove that belonged to the Moore family and had been in the basement was later found in the

company truck that Erickson had brought to the home; Robert's deoxyribonucleic acid (DNA) was found on the glove.[5] Testing revealed the presence of blood in the defendant's vehicle, which remained parked outside the home. The keys to his vehicle and a drill he used to install the control clock and timer were never found.

2. Evidence regarding criminal responsibility. It was undisputed at trial that the defendant was for many years a hardworking man, a good husband, and a devoted father to his three sons, especially his oldest son, who is autistic.

When the defendant was fourteen, his sister, who suffered from schizophrenia, committed suicide by lighting herself on fire.[6] The defendant since childhood has had a seizure disorder, which he managed with medication.

In 2001, while an irrigation business that the defendant had started after leaving White's irrigation company (and which later failed) was facing significant financial difficulties, he began seeing a therapist, who prescribed him Klonopin to treat his anxiety. His financial troubles did not end when the defendant returned to work at White's irrigation company. At the time of the incidents on November 2, 2007, a lien had been

---

[5] The other glove of the pair was missing from the basement and was never found.

[6] No expert at trial offered the opinion that the defendant suffered from schizophrenia.

placed on his home for failure to repay a loan and, as testified to by his wife, the family was living "week to week."

The first indication of possible mental illness occurred at a Christmas dinner in 2006 with the defendant's extended family at his sister's house, when the defendant became so upset about a comment directed at his older son that he abruptly ordered his family to walk out of the dinner.

His mental health problems became more apparent in the spring of 2007. He told his close friend, Sean Clancy, that he had discovered "insider trading" on the Internet, and that there were two stock brokers who were aware that the defendant had uncovered their scheme, who "kn[e]w everything about" the defendant, and who "were [not] fooling around." He told his wife that he had stumbled on a Web site he was not supposed to have found, and that people were "after him." He said that these people were trying to kill him, and that they would also kill his wife and their children. The defendant discussed his fears about these people with Clancy "every day." At one point, Clancy discovered that the defendant had disassembled his entire home computer. When Clancy asked why, the defendant responded, "I've got to find out where they're getting in." His wife testified that the defendant thought he saw messages flashing across the screen of their television and on a bumper sticker on a vehicle that he saw on the highway.

On a few occasions in 2007, the defendant told his wife that people were following him. One morning in July, 2007, the defendant was sitting with Clancy in Clancy's truck drinking coffee when a vehicle approached, and the defendant suddenly crouched down to the floor of the truck and began screaming at Clancy to drive away. As the vehicle came close, Clancy realized the driver was an older woman, but the defendant had covered his face with his hands and then quickly left the truck. When Clancy tried to ask the defendant about the incident, he did not want to talk about it.

The defendant was hospitalized after an incident that occurred at the end of August, 2007. The defendant had come home from work "very anxious and scared," and insisted that someone had been following him. When his son showed them a digital video disc (DVD) he had received from a neighbor about the Middle East, the defendant was convinced that the DVD contained a secret message. When his wife tried to explain to him that he was not making any sense, he slapped her (which he had never done before), pushed her to the ground, and begged her to please listen to him, saying that the family had to watch the DVD or they would be killed. He said that nobody could leave the house or use the telephone or Internet. She managed to calm him down by agreeing to watch the DVD, and then she ran out of the house and telephoned 911 from a neighbor's home.

Paramedics arrived and transported the defendant to Norwood Hospital, but he walked away from the hospital and could not be found. At 5 A.M. the next morning, Norwood police found him in a cemetery. He was holding a rock in his hand and talking about plutonium that he claimed was buried in the cemetery and the dangers arising from the September 11, 2001, attack. He was transferred to the secure psychiatric ward at Newton-Wellesley Hospital, where he was given a diagnosis of psychotic disorder not otherwise specified. He spent five days in the ward, where he was prescribed an antipsychotic medication, in addition to Klonopin. He was released from the hospital on September 5 and began receiving treatment from clinicians at Riverside Community Health Center. As he adjusted to the new medication, his wife described him as "very foggy all the time . . . and almost childlike in a way." He returned to work approximately two weeks after leaving the hospital.

The defendant was hospitalized a second time after an incident that occurred in mid-October, 2007. He had not slept for twenty-four hours, so his wife went to check on him in the middle of the night. She found him in the kitchen, having removed all of their knives and laid them on the counter. While she was on the telephone with the defendant's doctor, the defendant told her, "I took a fist full of pills." She checked

his bottle of Klonopin and discovered that approximately thirty pills were missing.  She took him to Norwood Hospital.[7]

At the hospital, the defendant told the doctors that he was doing well, but was drinking fourteen cups of coffee per day. The doctor who examined him noted in his report that the defendant's thought process was coherent with "[n]o looseness of association or flights of ideas."  The doctor's report stated "the patient believably denied any suicidal thoughts . . . the patient's thought content did not indicate any delusions, paranoia, or hallucinations," and the defendant was "very clear" in explaining that taking the pills was a "poor judgment call." The doctor noted that the defendant's wife did not feel he needed to be hospitalized and was not concerned about his safety at home.  The doctor recommended he decrease his coffee intake in order to improve his sleep and prescribed him an antidepressant that is particularly helpful for sleep.  He was released from Norwood Hospital on October 21.  The defendant returned to work the next week.

The defendant's mental condition appeared to stabilize after his release from his second hospitalization.  On the weekend of October 27-28, the defendant and his wife took a trip to Providence, Rhode Island, for her birthday, and "he seemed

---

[7] The medical records reflect the defendant's apparent overdose of Klonopin medication but make no mention of the removal of the knives onto the kitchen counter.

happier" and was not paranoid.  On November 1, the day before the incident, the defendant worked the entire day with White, doing winterizations.  White testified that the defendant bought him lunch and was "in a good mood."  White discussed with him the possibility of the defendant taking over White's irrigation business after White retired.  The defendant saw his therapist that day at Riverside Community Health Center, who reported that the defendant said he was "feeling much better and sleeping better" and seemed "much calmer and relaxed [and h]e is beginning to open up more and talk about himself."

The defense presented two expert witnesses who offered testimony regarding the defendant's mental health.  Dr. Charles Carroll, director of forensic services at Bridgewater State Hospital (Bridgewater), opined that the defendant "has a major mental illness" and that "the central feature of his major mental illness is thinking that is not based in reality."  Dr. Carroll, however, spoke on the basis of his interactions with the defendant at Bridgewater, and did not complete a criminal responsibility evaluation because the defendant declined to participate in an evaluation.  Dr. Carroll's assessment was that the defendant was not "forthcoming" because of "non-reality-based ideas, psychotic ideas that he had, that his family was in danger and that if he talked about the things that were on his mind that this would put his family in further danger, and he

was protecting his family by not talking."  In Dr. Carroll's opinion, it was unlikely that the defendant actually blacked out and did not remember what occurred on the day of the incident.

Dr. Keith Ablow opined that the defendant was suffering "with both major depression and with psychotic disorder not otherwise specified" on the day of the alleged crimes.  He offered the opinion that the defendant could not distinguish right from wrong that day or conform his behavior to the requirements of the law.  In contrast with Dr. Carroll, Dr. Ablow's opinion was based in part on what the defendant told him about the defendant's thinking on the day of the killing:  that he recalled that Robert mentioned having retired from working for International Business Machines (IBM), that there was a terrible conflict between IBM and Hewlett-Packard Corporation, and that, as described in Dr. Ablow's notes, "Hewlett-Packard might be empowered as a corporation and that could change the balance of power in the world."

The Commonwealth offered the expert testimony of Dr. Alison Fife in rebuttal.  Dr. Fife opined that the defendant had the capacity both to appreciate the wrongfulness of his conduct and to conform his conduct to the law on the day of the alleged crimes.  Although Dr. Fife agreed with Dr. Ablow's diagnosis that the defendant suffered from psychotic disorder not otherwise specified, she emphasized that "there are very

effective treatments for psychosis today" and a person with such disorders can exhibit free will.  Her conclusion was that the defendant's psychosis had been well treated with medication after his second hospitalization, that he showed no signs of psychosis or delusions on the day of the killing, and that it was not possible that he somehow "snap[ped] into" a delusional psychosis when he entered the cellar of the victim's home.  In reaching her opinion, she weighed heavily the therapist's assessment of the defendant during his visit on the day before the killing and the defendant's "level of organization" on the day of the killing, declaring that she knew from her experience that an individual actively suffering from psychosis "would not have been able to carry out those usual activities in that organized a fashion."  She also found significant the defendant's efforts to clean up the scene of the killing and to hide the victim in the utility room in the basement which, along with his attempted flight from the scene, suggested that the defendant appreciated the wrongfulness of what he had done and was capable of conforming his conduct to the law.  In addition, she found significant that he said nothing to the police about any delusions or the conspiracy he believed he was thwarting and instead told the police that he had "blacked out" and had no memory of the events, which she described as "a convenient and

often-repeated excuse for behavior" in the absence of a psychosis.

Discussion. 1. Dr. Fife's testimony regarding fabrication. When asked whether her opinion was affected by the defendant's statements to Dr. Ablow that Robert's prior affiliation with IBM triggered the attack, Dr. Fife answered, "They don't necessarily affect it other than I think that they're fabricated." After the defendant objected, the judge asked Dr. Fife to clarify whether she meant that the defendant's statements were fabricated or that Dr. Ablow's report was fabricated. When she answered, "I'm not sure," the judge instructed the jury to "disregard the last response." The prosecutor then reframed the question, and asked Dr. Fife to assume that the statements were made by the defendant to Dr. Ablow. After the judge denied the defendant's objection to the question, Dr. Fife answered that she considered the statements in "that they were so far afield from anything that I had heard from the defendant." The judge, on hearing this answer, sua sponte sustained the earlier objection and told the jury to disregard the response. The defendant later moved for a mistrial, contending that Dr. Fife had deliberately "directly commented" on Dr. Ablow's credibility. The judge denied the motion but immediately instructed the jury that they "are to disregard any testimony about the fabrication of statements" and

"may not consider any comments on the credibility of any other witness in this case," adding that the evaluation of witness credibility "will be ultimately your determination."

The defendant claims that the judge abused his discretion in not granting a mistrial.  He did not.  The judge multiple times told the jury to disregard Dr. Fife's answers to these questions, and we presume that the jury complied with his direction.  See Commonwealth v. Alcantara, 471 Mass. 550, 556 (2015), quoting Commonwealth v. Watkins, 425 Mass. 830, 840 (1997).  The judge at sidebar said that he recognized that Dr. Fife was unwilling to accept the prosecutor's assumption that the defendant made these statements, either because she did not believe they were made or did not believe they were true, and he was going to cut off any further questions from the prosecutor on this subject to avoid the risk that Dr. Fife would tell the jury what the defendant had said to her regarding his commission of the offense.  See G. L. c. 233, § 23B (in criminal trial, "no statement made by a defendant therein subjected to psychiatric examination pursuant to [G. L. c. 123, §§ 15 or 16,] for the purposes of such examination or treatment shall be admissible in evidence against him on any issue other than that of his mental condition, nor shall it be admissible in evidence against him on that issue if such statement constitutes a confession of guilt of the crime charged"); Blaisdell v. Commonwealth, 372 Mass.

753, 763 (1977) (construing word "confession" in G. L. c. 233, § 23B, "to include inculpatory statements constituting admissions short of a full acknowledgement of guilt"). The judge ably addressed this dilemma and avoided undue prejudice through his rulings and prompt instructions to the jury. He acted well within his discretion in denying the defendant's motion for a mistrial.

2. The verdict slip error characterizing the armed assault with intent to murder indictment as assault with intent to murder. The indictment charging the defendant with armed assault with the intent to murder was attached to the verdict slip, but the verdict itself asked the jury to find the defendant not guilty, not guilty by reason of lack of criminal responsibility, or guilty of "assault with intent to murder." After the jury returned their verdicts, the judge noted the error in the verdict slip and asked the defendant if he wished to object to the verdict on that indictment. Defense counsel said he would like to take some time to think about it and, after a recess, moved to vacate the conviction because the verdict slip was missing the word "armed." The judge denied the motion, concluding that the error was akin to a "scrivener's error." He noted that the jury were instructed only as to armed assault with the intent to murder and that, when he went over

the verdict slip with them, he described the charge as armed assault with the intent to murder.

The judge did not err in denying the motion. We recognize that the long-standing general rule of law is that "[t]he only verdict which can be received and regarded, as a complete and valid verdict of a jury, upon which a judgment can be rendered, is an open and public verdict, given in and assented to, in open court, as the unanimous act of the jury, and affirmed and entered of record, in the presence and under the sanction of the court." Commonwealth v. Harris, 23 Mass. App. Ct. 687, 692 (1987), quoting Lawrence v. Stearns, 11 Pick. 501, 502 (1831). The strict application of this general rule is "a safeguard against mistakes, and to assure that the public has confidence in the administration of justice, . . . on occasion with the effect of defeating a jury's probable intent." Commonwealth v. Andino, 34 Mass. App. Ct. 423, 426 (1993). We also recognize that in similar circumstances the Appeals Court in Harris, supra at 689-693, held that the spoken verdict of assault with the intent to murder must stand even though the indictment charged armed assault with the intent to murder, the judge instructed only as to armed assault with the intent to murder, and the jury found the defendant guilty of a separate indictment of assault and battery by means of a dangerous weapon.

But the general rule is not without exception. See Commonwealth v. McCarthy, 37 Mass. App. Ct. 113, 117 (1994) ("This general rule has been applied strictly, but not without limit"); Andino, 34 Mass. App. Ct. at 426 ("[s]ome limits" to general rule "have been recognized"). In Harris, 23 Mass. App. Ct. at 693 n.9, where the general rule was applied, the Appeals Court declared that the jury's spoken verdict may not have been a mistake because "[i]t was open to the jury to find that the defendant had committed an unarmed assault on the victim immediately prior to the armed assault relied on by the prosecution to support the indictment." In contrast, where it is certain that the jury intended to convict on the greater charge and where the evidence would not permit a guilty verdict on the lesser charge, the conviction of the greater offense has been allowed to stand despite the erroneous description of the charge in taking the verdict. See McCarthy, supra at 118.

Here, we have no doubt that the jury intended to convict the defendant of armed assault with the intent to murder rather than the lesser included offense of assault with the intent to murder. The judge provided careful jury instructions, both orally and in writing, that made clear that the jury needed to find that the defendant was armed in order to convict on this indictment. The judge did not provide the jury with a lesser included offense instruction, no doubt because the evidence did

not reasonably permit such an instruction; given Nancy's injuries, the jury could not reasonably have found the defendant guilty of assault with the intent to murder if the jury had not also found that the defendant was armed with a baseball bat or a shod foot. The jury clearly found that the defendant was armed because they convicted the defendant of assault and battery with a dangerous weapon. If there were any reasonable possibility that the jury intended the lesser verdict, we would give the defendant the benefit of the lesser conviction. But there is no such reasonable possibility here.

3. The jury instruction explaining what happens if the jury were to find the defendant not guilty by reason of lack of criminal responsibility. In his final instructions to the jury, the judge explained to the jury "what happens to a defendant if he is found not guilty by reason of lack of criminal responsibility."[8] The defendant made no objection to this

---

[8] The judge's instruction is set forth below:

"I'm now going to instruct you on the consequences of a verdict of not guilty by reason of lack of criminal responsibility. As I previously instructed, your decision should be based solely on the evidence and the law of this case without regard to the possible consequences of the verdicts. You may not consider something -- you may not consider sentencing or punishment in reaching your verdicts. However, I am going to tell you what happens to a defendant if he is found not guilty by reason of lack of criminal responsibility. The Court may order the defendant to be hospitalized at a mental facility for a period of [forty] days for observations and examination. During this

instruction. On appeal, however, he claims that the judge erred in not making it more clear to the jury that, if they found the defendant not guilty by reason of lack of criminal responsibility, the defendant could be committed for the rest of his life, and this error created a substantial likelihood of a miscarriage of justice.

In Commonwealth v. Chappell, 473 Mass. 191, 205 (2015), we determined that the model jury instruction about the consequences of a verdict of not guilty by reason of lack of criminal responsibility, which was derived from Commonwealth v.

observation period or within [sixty] days after a verdict of not guilty by reason of lack of criminal responsibility, the District Attorney or other appropriate authorities may petition the Court to commit the defendant to a mental health facility or to Bridgewater State Hospital.

"If the Court then concludes that the defendant is mentally ill and that his discharge would create a substantial likelihood of serious harm to himself or others, the Court may grant the petition and commit him to a proper mental health . . . facility or to Bridgewater State Hospital for six months. Periodically the Court reviews the orders of commitment. If the person is still suffering from a mental illness or defect and is still dangerous, he is kept in that facility and depending on his condition, the type of facility is considered.

"If the person is no longer mentally ill and can resume mental life -- excuse me -- and can resume a normal life, he is later discharged. The District Attorney must be notified of any hearing concerning whether the person may be released, and the District Attorney may be heard at any such hearing. However, the final decision on whether to recommit or release the person is always made by the judge. This is what happens if you find the defendant not guilty by reason of lack of criminal responsibility."

Mutina, 366 Mass. 810, 823 & n.12 (1975) (Mutina instruction), should be modified to inform the jury, "There is no limit to the number of such renewed orders of commitments as long as the defendant continues to be mentally ill and dangerous; if these conditions do continue, the defendant may remain committed for the duration of his [or her] life." Chappell, supra at 205-206, 209 (Appendix). We declared that this addition to the Mutina instruction would better explain to the jury "what protection they and their fellow citizens will have if they conscientiously apply the law to the evidence and arrive at a verdict of not guilty by reason of [lack of criminal responsibility]." Id. at 206, quoting Mutina, supra at 821-822. The defendant essentially claims that the judge erred in giving the Mutina instruction rather than the Chappell instruction.

In Chappell, 473 Mass. at 205, although we provided a provisional jury instruction to be given in the future, we concluded that the judge did not err in giving the Mutina instruction. The trial in this case occurred four years before our opinion in Chappell. The judge here, like the judge in Chappell, did not err in giving the Mutina instruction that, at the time of trial, was the governing model jury instruction.

4. Absence of a jury instruction regarding the effects of drugs on the defendant's criminal responsibility. In Commonwealth v. DiPadova, 460 Mass. 424, 435 (2011), issued two

months before the trial in this case, we declared that, where the defendant's criminal responsibility was at issue and where there was evidence that the defendant had used drugs prior to the murder, "the defendant was entitled to an instruction informing the jury that, if his mental illness alone had caused him to lack criminal responsibility at the time of the murder, any drug use that increased or aggravated his condition did not negate his lack of criminal responsibility."  The defendant did not request such an instruction or object to its omission.  On appeal, however, he claims that the absence of such an instruction created a substantial likelihood of a miscarriage of justice.

We conclude that the judge did not err in omitting this instruction.  There was no evidence at trial that the drugs prescribed to manage his mental illness "increased or aggravated his mental illness."  In the absence of such evidence, the defendant was not entitled to this instruction.

5.  Review under G. L. c. 278, § 33E.  Where a verdict of murder in the first degree is contrary to law or the weight of the evidence, or where it is otherwise not "consonant with justice," we have the authority under G. L. c. 278, § 33E, to order a new trial or to direct the entry of a lesser degree of guilt.  See, e.g., Commonwealth v. Gould, 380 Mass. 672, 680 (1980), quoting Commonwealth v. Davis, 380 Mass. 1, 15 n.20

(1980). The defendant contends that we should exercise that authority in this case primarily because "[i]t is clear that the only motive for the killing is psychotic and paranoid delusions and ideations produced by the defendant's [documented] mental illness." We recognize the profoundly perplexing nature of this killing: a defendant whose psychosis with paranoid delusions appeared to be successfully managed by medication and who appeared to be able to function normally in accomplishing the complex task of designing and installing an irrigation system suddenly bludgeoned to death an elderly customer with a baseball bat in what appears to be an inexplicable rage. But "the power of this court under § 33E is to be exercised with restraint," Gould, supra, and this case calls for such restraint because, after carefully reviewing the record in this case, we conclude that the verdict is not contrary to the weight of the evidence or otherwise not consonant with justice.

The jury were entitled to credit Dr. Fife's expert opinion that the defendant had the capacity to appreciate the wrongfulness of his conduct, and there was compelling evidence in support of that opinion. He took great care to clean up the scene of the crime after the killing and to move Robert's body to the utility closet; he assaulted and intended to kill Nancy when he thought that she would discover the crime; and he

immediately fled the scene in an attempt to avoid apprehension when he realized that James had found Nancy in the basement.

The jury were also entitled to credit Dr. Fife's expert opinion that, despite the defendant's mental illness, he was capable of conforming his conduct to the law when he committed these brutal crimes, and there was substantial evidence in support of that opinion. With the medication he was prescribed, he appeared to be fully functional during the weekend before the killing (when he traveled to Providence with his wife), on the day before the killing (when he spent the day working with his boss and saw his therapist), and on the day of the killing (when he designed and installed an irrigation system). The jury reasonably could credit Dr. Fife's testimony that a person would not have this degree of functionality and then suddenly "snap into" a delusional psychosis when he went into the cellar to install the control clock and timer. We cannot be certain what triggered the defendant's rage, but the Commonwealth need not establish the defendant's motive for the killing. There was good reason to discredit the defendant's explanation for his conduct that he gave to Dr. Ablow, and the jury reasonably could have rejected Dr. Ablow's opinion to the extent it rested on this explanation.

Conclusion. We affirm the judgments of conviction and decline to exercise our authority under G. L. c. 278, § 33E, to

order a new trial or to reduce the conviction of murder in the first degree.

So ordered.
