NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12424


COMMONWEALTH  vs.  MIGUEL RIVERA.



Essex.     January 11, 2019. - May 14, 2019.

Present:  Gants, C.J., Lenk, Gaziano, Cypher, & Kafker, JJ.


Homicide.  Evidence, Admissions and confessions, Voluntariness
     of statement, Hearsay, Spontaneous utterance, Intent.
     Constitutional Law, Admissions and confessions,
     Voluntariness of statement.  Practice, Criminal, Capital
     case, Motion to suppress, Admissions and confessions,
     Voluntariness of statement, Hearsay, Argument by
     prosecutor.  Intent.



     Indictment found and returned in the Superior Court
Department on February 18, 2015.

     A pretrial motion to suppress evidence was heard by James
F. Lang, J., and the case was tried before Richard E. Welch,
III, J.


     Elizabeth Caddick for the defendant.
     Kenneth E. Steinfield, Assistant District Attorney, for the
Commonwealth.


     LENK, J.  On the evening of February 15, 2015, Omar Mendez

confirmed his intention to end a long-term relationship with the

defendant, and began packing his bags to leave.  Following a

heated argument between the two men, the defendant stabbed Mendez to death in the bedroom of their apartment, before attempting to end his own life. The defendant argued at trial that he should be convicted of voluntary manslaughter due to mitigating circumstances, such as heat of passion. A Superior Court jury, however, returned a verdict of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. In this direct appeal, he argues that the statements he made to police while in the hospital should have been suppressed, given his compromised medical and emotional state at the time. The defendant also maintains that the court should reduce the verdict to murder in the second degree, pursuant to G. L. c. 278, § 33E, in light of certain evidentiary issues, prosecutorial error in closing, and the spontaneity of the stabbing, and because the evidence of premeditation at trial was so tainted that it created a substantial likelihood of a miscarriage of justice. We discern no error warranting a new trial and no reason to exercise our extraordinary authority to afford relief under G. L. c. 278, § 33E. We accordingly affirm the conviction.

1. Background. The jury could have found the following. The defendant and the victim had been in a romantic relationship for approximately twenty-two years. They lived together in a one-bedroom apartment in Lawrence. In February of 2015,

however, the relationship between the two men had become strained, and the victim had been considering ending their relationship.

The victim's niece, Bianca Mendez,[1] and her mother, Maria Valentin, maintained a close relationship with both the victim and the defendant. One day in early February, the defendant telephoned Valentin while she was at work. He asked whether she had seen a post on social media by the victim in which he had described breaking up with the defendant. Valentin had not. The defendant then asked her whether she would be willing to speak with the victim in an attempt to convince him to change his mind about ending his relationship with the defendant. Valentin agreed to do so.

Shortly thereafter, the defendant and the victim went to Valentin's house in Pennsylvania for a weekend visit; they, along with Bianca, were to attend a baby shower for another relative in New York the following day. During the course of the trip, there was significant tension between the defendant and the victim. At one point, the defendant asked Valentin whether she had had a chance to speak with the victim about his decision to end his relationship with the defendant. She told the defendant that she had tried, but to no avail; the victim

---

[1] Because the victim and Bianca Mendez share the same surname, we refer to Bianca by her first name.

apparently had "made up his mind about moving on." The defendant also asked Bianca whether she would attempt to speak to the victim on his behalf, but she replied that she did not want to get involved.

The following week, Valentin and Bianca, along with Bianca's one year old daughter, drove to Lawrence to visit the victim and the defendant at their apartment for a long weekend. The group went out to eat, went to a mall, and socialized together for several days. Bianca and Valentin, however, again felt some discomfort due to evident tension between the victim and the defendant.

During the course of the visit, the defendant told Valentin that he was upset because the victim had obtained a new cellular telephone plan at the mall, to replace the plan that he and the defendant had shared. The victim told Valentin that he was waiting for the defendant to receive government benefits[2] before the two of them decided who would move out of their shared apartment.

On February 15, 2015, at approximately 4:30 P.M., the victim, Valentin, and Bianca were watching a movie in the living room; the defendant was alone in the bedroom. The victim told Bianca that he was pursuing a new relationship with someone he

---

[2] The defendant was disabled.

had met on a social media site; he also showed her a photograph of flowers that he had sent the man for Valentine's Day.

During the movie, the victim received a telephone call. He left the apartment through the rear kitchen door, which opened onto a stairwell; the victim then continued the conversation on the basement stairs. The defendant, who had overheard the victim speaking on the telephone, emerged from the bedroom. He asked Bianca and Valentin if the victim was "on the phone again," and whether he was speaking to "that motherfucker." They told him that they did not know who had called the victim. The defendant then followed the victim to the basement stairs.

After a few minutes, the defendant and the victim returned upstairs, shouting at one another.[3] The victim said that he did not want to argue in front of his family, and retreated into the bedroom to charge his telephone; the defendant followed. At some point while the two were in the bedroom, the victim began packing a suitcase.

---

[3] The defendant believed that the victim had been speaking with his new boyfriend, and asked why the victim was hurting him in that way. Bianca used her own cellular telephone to make a brief recording of the argument and sent it to her daughter's father, with whom she had been exchanging text messages, to demonstrate why she had been feeling uncomfortable during the trip. The recording captured a conversation between the defendant and the victim that alleged infidelity. It also recorded Valentin's statement that she, Bianca, and the baby would be leaving.

As the defendant and the victim were arguing in the bedroom, Bianca and Valentin decided that they should leave, and they began to gather their belongings.  The defendant walked past them and into the kitchen, where he remained for approximately ninety seconds.  He retrieved a knife from the kitchen sink, returned to the bedroom, and closed the door behind him.  Bianca and Valentin did not see that the defendant was carrying a large butcher's knife as he walked past them.[4]

Seconds later, the women heard the victim yelling Valentin's name and pleading for the defendant to "stop."  Valentin opened the bedroom door and saw the defendant on top of the victim.  The defendant said, "I told you I was going to kill you," as he repeatedly stabbed the victim.[5]  Valentin jumped on the defendant's back in an effort to stop him, and she pleaded with him as well.  The defendant pushed Valentin off of him, and she fell to the floor.  She yelled at Bianca to call 911 and to

---

[4] Bianca and Valentin later identified the knife as one they had used earlier in the day to cut a piece of cake and had left in the kitchen sink.

[5] The precise words the defendant used were contested at trial, and are a primary component of the defendant's appeal; Valentin was impeached by the absence of similar statements in her grand jury testimony and in one of her statements to police. In his challenge to the credibility of Valentin's later report that the defendant spoke those words, the defendant also points out that Valentin's statement to a second police officer, which also did not contain any report of the defendant having made a statement similar to the one contested at trial, was not introduced at trial.

get out of the apartment with the baby.[6]  Valentin then backed out of the bedroom and, along with Bianca and the baby, fled up the back stairs to a neighboring apartment, where they waited for police.

A responding officer arrived within minutes of the 911 call, and another officer joined him shortly thereafter.  They entered the apartment and found the victim lying face down in a pool of blood.  He had suffered thirteen stab wounds:  one to the head, six to the chest, and six to his arms, forearms, and hands.[7]  The defendant was lying next to the victim, and appeared to have life-threatening injuries as well, which officers later learned had been self-inflicted; the defendant had multiple stab wounds in the chest and had sliced open his wrist.  A large knife was lying on the floor nearby.  The officers secured the knife and handcuffed the defendant; they then began administering first aid until paramedics could reach the scene.

---

[6] Valentin ultimately spoke with the 911 operator, as Bianca had lost her voice due to an illness and was unable to convey the details of the emergency over the telephone.

[7] The medical examiner testified that five of the wounds were "stab" wounds, which are deeper than they are wide; eight others were "incise" wounds, which are longer cuts on the surface than they are deep.  The wound to the head and three of the chest wounds were stab wounds.  One of the chest wounds pierced the victim's lung and severed his aorta.  The medical examiner opined that the victim would have died within minutes, and that it would have been difficult to breathe as his lungs filled with blood.

When paramedics arrived, they promptly determined that any attempts to revive the victim would be futile, and focused their efforts on the defendant. After providing emergency treatment at the scene, they transported the defendant by ambulance to a hospital. In the ambulance, the defendant was conscious and responsive to questions from one of the paramedics, who was assessing what had happened. The defendant told the paramedic that he and the victim had been in a relationship for twenty-two years, and that the defendant had stabbed the victim because he had broken up with the defendant.

After arriving at one hospital, the defendant was then transported to another hospital by ambulance. One of the investigating officers rode in the ambulance with the defendant, while another followed the ambulance to the hospital. The officers provided the defendant with Miranda warnings twice during this period: once in the ambulance, and again while at the hospital.[8] After waiving the Miranda rights, the defendant agreed to speak with the two officers.[9] He told them that he had

---

[8] The officer who accompanied the defendant in the ambulance provided the defendant with Miranda warnings, but did not attempt to question him. Police reiterated the warnings later that evening, at the hospital.

[9] The motion judge determined that the defendant was unable to sign a waiver form at the hospital due to the intravenous lines in his arms and bandages on his wrist. The judge found that the tone of the questioning was "conversational, low-key, respectful, and even, for the most part, sympathetic."

become emotional when he heard the victim speaking to his new boyfriend on the telephone; he then took a knife from the kitchen and tried to reason with the victim, but ultimately "lost it" and "blacked out."[10]  The defendant also explained to the officers that he suffered from depression and anxiety, took medication for those conditions, and felt unsafe whenever the victim was not with him.  The defendant did not remember how many times he had stabbed the victim, but recalled that he tried to end his own life afterward.

At trial, the theory of defense was that the defendant had become enraged in a heat of passion following the victim's telephone call and subsequent decision to pack his bags and leave.  The defendant requested that the jury convict him of voluntary manslaughter because the Commonwealth had not proved, beyond a reasonable doubt, the absence of mitigating factors, such as reasonable provocation or heat of passion.  The jury, however, returned a verdict of guilty of murder in the first degree on theories of deliberate premeditation and extreme cruelty or atrocity.

2.  Discussion.  In this appeal, the defendant argues that a new trial is warranted because he did not knowingly and voluntarily waive his Miranda rights or make a voluntary

---

[10] Deoxyribonucleic acid testing of the knife matched the defendant's profile, and did not match the victim's profile.

statement to police, due to his compromised medical and emotional state in the hospital. In the alternative, he contends that when certain evidentiary issues and errors in the prosecution's closing are considered in concert with the spontaneity of the attack, a reduced verdict of murder in the second degree, pursuant to G. L. c. 278, § 33E, would be more consonant with justice. The defendant also maintains that the stabbing here was not more aggravated or unusual than other instances of homicide so as to sustain a conviction on the theory of extreme atrocity or cruelty. We address each of his claims in turn.

a. <u>Motion to suppress</u>. The defendant contends that the statements he made to police should have been suppressed because he did not knowingly and voluntarily waive his rights, and his statements were not voluntary, given the physical and emotional distress he was experiencing at the hospital. Following an evidentiary hearing, a Superior Court judge, who was not the trial judge, denied the motion to suppress. He found that the defendant had responded appropriately to the officers' preliminary questions gauging his alertness, as well as to questions about his level of pain, his medications, and his state of orientation. The judge noted that the defendant also responded appropriately to more substantive questions, and evidently understood the circumstances and nature of the

questioning.[11]  The motion judge found also that the entirety of the interview was conducted in a sympathetic and conversational tone to accommodate the defendant's fragile state.  The judge determined that the Commonwealth had demonstrated, beyond a reasonable doubt, that the defendant's physical and mental condition did not negate his ability knowingly and voluntarily to waive his rights, or to provide a statement to police.

"In reviewing a decision on a motion to suppress, we accept the judge's subsidiary findings absent clear error, but conduct an independent review of [his or her] ultimate findings and conclusions of law" (quotation and citation omitted).  See Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).  We defer to the judge's determination of the weight and credibility to be given to oral testimony presented at a motion hearing, but we may independently review the documentary evidence before the judge.  See Commonwealth v. Tremblay, 480 Mass. 645, 655 (2018).

Where, as here, a defendant makes statements to police during a custodial interrogation, the Commonwealth bears the

---

[11] As to the nature of the questioning, the motion judge also found that the defendant was able to detail the dispute with his boyfriend, the stabbing, and the suicide attempt.  He also made statements attempting to minimize his culpability, including repeatedly noting that he suffered from mental illnesses and had "blacked out" during the stabbings.  See Commonwealth v. Tremblay, 480 Mass. 645, 656-658 (2018) (defendant was responsive to police questions and even minimized his culpability, leading to conclusion that statements were voluntarily given).

burden of proving, beyond a reasonable doubt, that the defendant's waiver of his or her Miranda rights was "voluntary, knowing, and intelligent."[12]  See Commonwealth v. Clarke, 461 Mass. 336, 342 (2012); Commonwealth v. Gaboriault, 439 Mass. 84, 89 (2003).  The Commonwealth also must show that any statement made after a waiver was voluntary, as a product of the defendant's "rational intellect and free will."  See Commonwealth v. Hoose, 467 Mass. 395, 403 (2014).  "Although we inquire separately into the voluntariness of the defendant's waiver of Miranda rights and the voluntariness of the statements, both inquiries require us to examine the totality of the circumstances surrounding the making of the statements to ensure that the defendant's will was not overborne."  Id. Relevant factors in this analysis include the manner in which the interrogation is conducted, whether Miranda warnings were given, the defendant's physical and mental condition, and the defendant's individual characteristics, such as age, education, intelligence, and emotional stability.  See id.  The court will indulge all "reasonable presumption[s] against waiver." Commonwealth v. Bradshaw, 385 Mass. 244, 267 (1982).

---

[12] It is undisputed that the defendant was in custody for purposes of Miranda v. Arizona, 384 U.S. 436, 451 (1966).  See generally Commonwealth v. Groome, 435 Mass. 201, 211-212 (2001).

We discern no error in the motion judge's findings that the defendant's mental capacities and rational intellect were not impaired to such a degree as to render his waiver or statements involuntary.  Although statements that are "attributable in large measure to a defendant's debilitated condition" are not considered to be voluntarily made (citation omitted), see Commonwealth v. Waweru, 480 Mass. 173, 180 (2018), "[t]he fact that a defendant may have been in a disturbed emotional state, or even suicidal, does not automatically make statements involuntary," see Commonwealth v. LeBlanc, 433 Mass. 549, 555 (2001).  Indeed, we repeatedly have held that a defendant who is suffering from emotional or physical distress still may provide voluntary statements so long as he or she demonstrates an intelligent comprehension of his or her Miranda rights and of the circumstances.  See, e.g., Commonwealth v. Bell, 473 Mass. 131, 141-142 (2015), cert. denied, 136 S. Ct. 2467 (2016) (statements made by defendant were voluntary despite significant burns and intoxication because he "demonstrated awareness of the situation at the scene . . . and did not show any great confusion"); Commonwealth v. Clark, 432 Mass. 1, 11, 12-13 (2000) (statements made by defendant shortly after he sustained

gunshot wound to head were voluntary, given evidence that he had been "alert and oriented").[13]

Similarly, here, the defendant was not demonstrating confusion or otherwise "acting irrationally [during the interrogation]" while speaking with police (citation omitted). See Commonwealth v. McNulty, 458 Mass. 305, 328 (2010). Although the defendant was suffering from physical and emotional injuries, the motion judge found that any medications he took for those conditions or for his anxiety and depression did not hinder his ability to think clearly. See Waweru, 480 Mass. at 176-177, 181 (despite defendant's suicide attempt after stabbing victim, his statements to psychiatrist and police were voluntary, as he understood their questions and responded appropriately); Bell, 473 Mass. at 142 (relevant evidence is suspect's "rational understanding of the situation and a

---

[13] The defendant would have us distinguish his case from others concerning an injured suspect's statement, on the ground that police did not know whether the defendant was taking medication, or otherwise presented with a condition that might hinder his ability to think clearly, because the defendant's treatment providers had refused to give police access to his medical records. As the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d-6, prevents medical professionals from disclosing a patient's medical records, police are unable, in many instances, to ascertain a defendant's medical information. We have not adopted an approach that looks solely at one such factor, and decline to do so today. See Commonwealth v. Hoose, 467 Mass. 395, 403 (2014) (requiring us to examine "totality of the circumstances" in voluntariness inquiry).

voluntary decision to speak to police").  Because the defendant's waiver of rights and his statements to police were knowing and voluntary, we discern no error in the denial of his motion to suppress.

b.  Relief under G. L. c. 278, § 33E.  With respect to the theory of deliberate premeditation, the defendant challenges testimony from Bianca and Valentin about the statements he made as he stabbed the victim.  He also contends that the prosecutor argued facts not in evidence and misstated the law regarding issues that went to the heart of the defense.  The defendant maintains that, in light of the spontaneity of the attack, the evidence of deliberate premeditation was so "tainted" that a verdict on this theory cannot stand.  See Commonwealth v. Glass, 401 Mass. 799, 802 n.2 (1988) (even where evidence of premeditation is sufficient, it nonetheless may be "so tainted by the error that it created a substantial likelihood of a miscarriage of justice").  In this regard, as far as we can tell, the defendant posits that the cumulative effect of the issues warrants the exercise of our extraordinary authority under G. L. c. 278, § 33E, to reduce the verdict to murder in the second degree.

i.  Witness testimony.  The defendant argues that Bianca's testimony about his statement to the victim ("I told you I was going to kill you") constituted inadmissible hearsay.  He also

claims that, because Valentin was substantially impeached with her omission of the defendant's statement in her report to police and to the grand jury, Valentin's trial testimony should be given no weight. Because neither statement was objected to at trial, we review for a substantial likelihood of a miscarriage of justice. See Commonwealth v. Seino, 479 Mass. 463, 470 (2018).

In regard to Bianca's testimony, the defendant contends that it constitutes impermissible hearsay because his statements were relayed to Bianca, who does not speak Spanish fluently, through her mother, who does. In general, "evidence based on a chain of statements is admissible only if each out-of-court assertion falls within an exception to the hearsay rule." Commonwealth v. Alcantara, 471 Mass. 550, 558 (2015), quoting Commonwealth v. McDonough, 400 Mass. 639, 643 n.8 (1987). See Mass. G. Evid. § 805 (2019) (statements of multiple out-of-court declarants are admissible only if each statement falls within established hearsay exception).

Each of the statements conveyed in the chain at issue here falls within an exception to the hearsay rule and therefore is admissible. First, the defendant's statements are not considered hearsay. See Commonwealth v. Bright, 463 Mass. 421, 426 n.8 (2012) (admissions of party opponent are not considered hearsay). Second, Bianca testified that, although her mother

told her what the defendant had said, she had heard and understood portions of the defendant's statement in Spanish before her mother translated it.[14] Insofar as Valentin relayed the rest of the defendant's statement to Bianca, it was nonetheless admissible under the spontaneous or excited utterance exception to the rule against hearsay. See Mass. G. Evid. § 803(2) (2019) (spontaneous utterance if event is "sufficiently startling to render inoperative the normal reflective thought processes of the observer, and . . . the declarant's statement was a spontaneous reaction to the occurrence"). Indeed, both women were percipient witnesses to the stabbing, relaying startling information to the 911 operator, and fled the apartment in fear for their lives. Cf. Alcantara, 471 Mass. at 558 (statements made on 911 call, conveying information relayed by different percipient witness, were admissible as excited utterances).

Moreover, we are unpersuaded by the contention that, because Valentin was impeached with a prior inconsistent statement or omission, no weight should be given to her trial testimony. Where trial counsel carefully pursued and developed the inconsistencies in her testimony during cross-examination,

---

[14] Specifically, Bianca testified that she understood the Spanish words for "kill you," and that the word "motherfucker" was uttered in English.

the credibility of her statements was a matter properly reserved for the jury.  See, e.g., Commonwealth v. Cannon, 449 Mass. 462, 469 n.17 (2007) (credibility of witness's statement is province of fact finder); Commonwealth v. Triplett, 398 Mass. 561, 567 (1986) (fact finder must determine weight and credibility of testimony).[15]  We thus discern no substantial likelihood of a miscarriage of justice stemming from the admission of, or weight given to, either witness's testimony.

ii.  Prosecutor's closing argument.  The defendant challenges the propriety of the prosecutor's closing argument in two respects.  First, he contends that, by speculating about the defendant's state of mind when he closed the bedroom door, the prosecutor argued facts that were not supported by the evidence, and he attempted to negate the defendant's statement that he had "lost it" with an argument about premeditated calculation.  The defendant further argues that the prosecutor misstated the

---

[15] Although the defendant does not raise the issue, we conclude that trial counsel's failure to further impeach Valentin with the omission of the defendant's statement, "I told you I was going to kill you," in her second statement to police did not amount to ineffective assistance of counsel.  Trial counsel impeached Valentin with this omission from her grand jury testimony, as well as through another witness, the investigating officer, who testified that if Valentin had made such a claim, he likely would have included it in his police report.  See Commonwealth v. Fisher, 433 Mass. 340, 357 (2001) (counsel not ineffective in failing to impeach witness with prior inconsistent statement where witness already was impeached through other means).

applicable law by repeatedly telling the jury that sadness, anger, hurt, and frustration do not create "justification" for murder. The defendant contends that the repeated use of the word "justification" implied that he was required to demonstrate a justification for the killing in order to succeed in his defense. Because there was no objection to either statement, we review for a substantial likelihood of a miscarriage of justice. See Seino, 479 Mass. at 470.

A prosecutor may not "misstate the evidence or refer to facts not in evidence," and may not play "on the jury's sympathy or emotions, or comment on the consequences of a verdict" (citation omitted). See Commonwealth v. Carriere, 470 Mass. 1, 19 (2014). A prosecutor may, however, argue zealously "for a conviction based on the evidence and on inferences that may reasonably be drawn from the evidence." See id., quoting Commonwealth v. Kozec, 399 Mass. 514, 516 (1987). "Remarks made during closing arguments are considered in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." Commonwealth v. Viriyahiranpaiboon, 412 Mass. 224, 231 (1992). "The absence of an objection at trial may be viewed as 'some indication that the tone [and] manner . . . of the now challenged aspects of the prosecutor's argument were not unfairly prejudicial.'" Carriere, supra, quoting Commonwealth v. Mello, 420 Mass. 375,

380 (1995).  Moreover, "[i]nstructions may mitigate any prejudice in the final argument."  See Carriere, supra, quoting Kozec, supra at 517.

First, the defendant claims that the prosecutor mischaracterized his statements to police.  In this regard, the prosecutor argued:

> "And [the defendant] walked back into that bedroom.  He says he was in a rage, but he thought about it enough, he closed the door behind him.  He even told the police that he closed the door behind him because he didn't want the police to think that [Valentin] and Bianca were just watching him as he did this.  He closed the door behind him.  And that's when he attacked [the victim]."

As best we can tell, the defendant takes issue with the portion of that statement discussing his state of mind as he closed the door, especially because it negated the defendant's earlier statement in which he said he had blacked out in a rage.  The prosecutor's argument, however, is a fair inference drawn from the evidence at trial.  See Carriere, 470 Mass. at 22 (prosecutor may argue reasonable inferences grounded in evidence).  In fact, Valentin and Bianca both testified that the defendant walked past them and closed the door behind him before stabbing the victim.  The defendant also told police, "Obviously I closed the doors when it happened."  Although perhaps hyperbolic, as the prosecutor surely could not have known what the defendant was thinking as he closed the door, the prosecutor's remarks did not cross the line between fair and

improper argument in light of the evidence presented at trial. Even if it were not a fair inference, the judge properly instructed the jury on the role of closing arguments, the reasonable inferences the jurors may draw from evidence at trial, and their role as the sole finders of fact.[16] See id. at 19. Were there any question about a misstep in the prosecutor's statements, it did not create a substantial likelihood of a miscarriage of justice. See id.; Mello, 420 Mass. at 380.

Next, the defendant asserts that the prosecutor misstated the law of voluntary manslaughter and mitigating circumstances in closing, when he repeatedly used the word "justification." In this regard, the prosecutor argued:

> "It's not unusual in a breakup that you are scared or angry or frightened. But those things, ladies and gentlemen, are not mitigation. They are not a justification for what the defendant did. They are not an excuse to commit murder. . . . [U]nhappiness is not a justification for murder. Sadness is not a justification for murder. . . . Nobody wants to see somebody that they loved walk out the door. But that is not a justification for killing somebody. . . . A broken heart is not justification for murder."

We agree that the repeated use of the word "justification" throughout the prosecutor's closing was more than just an exercise in searching for a synonym for mitigation; it

---

[16] Moreover, prior to closing arguments, the judge told the jury: "I always instruct jurors, do not take notes on the closing arguments of counsel. And why do I tell you that? Any ideas?" A juror promptly responded that it was because a closing argument "is not evidence."

improperly suggested to the jury that the defendant was required to demonstrate justification for killing the victim.  Apart from being colloquially inapposite, the two words have distinct meanings in the law.  See Commonwealth v. Glover, 459 Mass. 836, 842 (2011) (noting difference between justification defense, which could result in acquittal, and mitigation defense, such as heat of passion, which at best yields conviction of lesser offense of voluntary manslaughter).

Notwithstanding the inappropriate nature of these remarks, the judge properly instructed the jury on the law of mitigation and voluntary manslaughter in his final charge, as well as the Commonwealth's burden of proof in these regards.  See Commonwealth v. Morales, 461 Mass. 765, 784-785 (2012) (prosecutor's misstatement of law was error, but judge's instructions rendered error harmless).  In light of these instructions, which we must presume were heeded, see id. at 784, we conclude that the prosecutor's misstatements did not create a substantial likelihood of a miscarriage of justice.

iii.  Premeditation.  The defendant contends also that there was no evidence of a plan to kill here, such that a conviction of murder in the second degree would be more consonant with justice.[17]  In determining whether a conviction of

---

[17] The defendant also contends that the trial judge abused his discretion in denying a motion to reduce the verdict

murder in the first degree is consonant with justice, "a primary consideration . . . is whether the killing reflects spontaneity rather than premeditation" (quotations and citation omitted). See Commonwealth v. Fernandez, 480 Mass. 334, 344 (2018). "In order to prove deliberate premeditation, the Commonwealth must show that 'the plan to kill was formed after deliberation and reflection.'" Id., quoting Commonwealth v. Bolling, 462 Mass. 440, 446 (2012). Although no particular length of time is required, "the Commonwealth must demonstrate that the defendant had the opportunity to reflect, however brief," before making a decision to kill. See Fernandez, supra at 345 (noting that key is "sequence of the thought process rather than the time which is taken to think" [citation omitted]). As each case depends on its own particular set of facts, no single factor is determinative. Id. See Commonwealth v. Colleran, 452 Mass. 417, 431-432 (2008) (setting forth range of factors to consider).

This case, however, does not suggest plain spontaneity or tainted premeditation. Rather, during a quarrel with his long-time boyfriend, the defendant left the bedroom, walked into the

---

pursuant to Mass. R. Crim. P. 25 (b) (2), as amended, 420 Mass. 1502 (1995). For many of the same reasons discussed, we discern no abuse of discretion in the motion judge's decision to deny the defendant's motion to reduce the verdict. See Commonwealth v. Perez, 477 Mass. 677, 681-682 (2017).

kitchen, waited approximately ninety seconds, picked up a knife, and returned to the bedroom, closing the door behind him before stabbing his partner to death. Cf. Fernandez, 480 Mass. at 345 (no spontaneity where defendant briefly left scene and returned with weapon to kill victim); Commonwealth v. Watkins, 373 Mass. 849, 852 (1977) (evidence that defendant, after quarrel with victim, went to kitchen, picked up knife, and returned to stab victim sufficient to sustain conviction of murder in first degree). On these facts, we discern no evidence of spontaneity or "tainted" premeditation that, in light of the combined weight of other purported errors, warrants the exercise of our extraordinary authority to reduce the verdict under G. L. c. 278, § 33E.

c. Extreme atrocity or cruelty. In regard to the second theory on which his conviction rests, the defendant contends that the killing in this case was not extremely atrocious or cruel because he did not take pleasure in the victim's suffering. He also points to data indicating that stabbings are not a particularly "extreme" or unusual method of homicide; indeed, the use of a stabbing or cutting instrument is the second most common form of homicide in the United States, following firearms. See generally United States Department of Justice, Crime in the United States: Murder by State, Types of Weapons, 2015, https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-

in-the-u.s.-2015/tables/table-20 [https://perma.cc/KH7N-TG3K].
As stabbings are so common, the defendant cautions that the
court should avoid sweeping every death by stabbing into the
category of murder in the first degree on a theory of extreme
atrocity or cruelty.  Although the defendant is correct that a
killing by stabbing does not necessarily surpass the ordinary
cruelty inherent in the taking of a human life, the evidence in
this case demonstrated extreme atrocity or cruelty.

In determining whether a killing was committed with extreme
atrocity or cruelty, we look to a set of well-established
factors.  See Commonwealth v. Cunneen, 389 Mass. 216, 227
(1983).  These include "indifference to or taking pleasure in
the victim's suffering, consciousness and degree of suffering of
the victim, extent of physical injuries, number of blows, manner
and force with which delivered, instrument employed, and
disproportion between the means needed to cause death and those
employed."  Id.

Here, the defendant stabbed the victim thirteen times,
including inflicting wounds through his head and his chest,
which caused the victim's lungs to collapse and fill with blood.
One of the wounds was more than seven inches deep.  The victim's
death was not instantaneous, and he suffered several defensive
wounds.  He also called out for help while he was being stabbed,
and begged the defendant to stop.  Moreover, Valentin attempted

to intervene, but, despite her best efforts, the defendant forcefully pushed her aside and continued stabbing the victim. Given the number of blows, the manner of attack, the size of the butcher's knife, and the medical expert's opinion concerning the likely degree of suffering on the part of the victim, we conclude that there was sufficient evidence to support the theory of extreme atrocity or cruelty in this case.  Compare Commonwealth v. Young, 461 Mass. 198, 204 (2012) (defendant stabbed victim four times and inflicted eight superficial cuts; victim experienced conscious suffering before his death).

Finally, pursuant to our duty, we have carefully reviewed the record and see no other cause to exercise our extraordinary power to grant relief under G. L. c. 278, § 33E.

Judgment affirmed.