SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. WILLIAM J. CAMUTI

 
 Docket:
 SJC-13532
 
 
 Dates:
 December 6, 2024 - April 9, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, & Dewar, JJ.
 
 
 County:
 Middlesex
 

 
 Keywords:
 Homicide. Misleading a Police Officer. Constitutional Law, Probable cause, Self-incrimination, Admissions and confessions, Voluntariness of statement, Waiver of constitutional rights. Search and Seizure, Probable cause, Warrant, Affidavit. Probable Cause. Evidence, Admissions and confessions, Voluntariness of statement. Practice, Criminal, Admissions and confessions, Voluntariness of statement, Warrant, Affidavit, Motion to suppress, Waiver, Capital case. Waiver.
 
 

             Indictments found and returned in the Superior Court Department on October 3 and November 15, 2013.
            Pretrial motions to suppress evidence were heard by Laurence D. Pierce, J., and the cases were tried before Bruce R. Henry, J.
            Dana J. Gravina for the defendant.
            Hallie White Speight, Assistant District Attorney, for the Commonwealth.
            DEWAR, J.  A jury found the defendant guilty on indictments charging him with murder in the first degree for the killing of Stephen Rakes, improper disposal of a body, and willfully misleading a police officer.  The defendant raises two principal claims in this direct appeal from his convictions.  First, he argues that certain evidence should have been suppressed at trial because it was the product of unconstitutional searches conducted pursuant to warrants not supported by probable cause.  Second, he contends that statements he made during two police interviews also should have been suppressed, because the Commonwealth failed to prove beyond a reasonable doubt both that his waivers of his Miranda rights were voluntary, knowing, and intelligent, and that the statements themselves were voluntary.
            We discern no error in the denial of the defendant's motions to suppress.  Following review of the entire record of this case under G. L. c. 278, § 33E, we affirm the defendant's convictions and decline his request that we order a new trial or reduce the conviction of murder in the first degree to a lesser degree of guilt.
            1.  Background.  a.  Facts.  We begin by summarizing the facts the jury could have found, reserving certain details for our discussion of the issues.
            A passerby discovered the victim's body by the side of Mill Street in Lincoln on July 17, 2013.  The victim was lying on his back in a wooded area ten to fifteen feet from the road, clad in a green and white striped shirt, khaki shorts, and sneakers -- the same clothes he had been seen wearing the day before.  His body displayed no obvious signs of trauma, and a forensic pathologist with the office of the chief medical examiner later determined that the cause of death was acute cyanide toxicity.  The police did not find identification for the victim at the scene but were able to identify him later the same day through a fingerprint database.  The police learned from his cell phone records that the last outgoing calls from his cell phone had been made the prior day, July 16, to a number that belonged to the defendant.  Through a search of the victim's apartment and computer, the police further learned that the victim and the defendant had exchanged numerous e-mail messages.  As the police would later learn, the defendant and victim had been friends for approximately thirty years and also worked on real estate ventures together.
            The following day, July 18, police interviewed the defendant in person at his apartment in Sudbury and, later the same day, spoke with him by telephone.  In the initial, in-person interview, the defendant told the police that, during the then ongoing Federal criminal trial of James "Whitey" Bulger, he and the victim had been speaking frequently.  The victim was an alleged victim of Bulger, was attending the trial, and had been scheduled to testify on July 17, 2013.[1]  The defendant told police that on July 16, in their usual morning call, the victim had asked the defendant to meet him at a Waltham fast food restaurant after the trial proceedings concluded for the day, and the two had met at the restaurant at approximately 1:30 or 1:45 P.M. over iced coffees.  Later on July 18, police found the victim's vehicle in the parking lot of the restaurant.  During the subsequent telephone interview, the defendant's account of his July 16 meeting with the victim differed in a number of respects from his earlier account, as we discuss in greater detail below in connection with the defendant's motion to suppress the fruits of the ensuing search warrants. 
            The police quickly determined that the defendant's claim that the victim initiated the July 16 meeting was false.  In the victim's car, the police found digital voice recorders on which the victim had recorded numerous telephone calls with the defendant, including their call on the morning of July 16.  That recording revealed that it was the defendant, not the victim, who requested that the two men meet that afternoon.  During the call, the defendant told the victim that he had favorable news concerning a long-hoped-for sale of a $28 million judgment the victim had obtained against Bulger:  a check for $3 million was in the mail.  The defendant also had information about a potential investment opportunity in Wilmington and wanted to show the victim the Wilmington property that afternoon.  The victim agreed to accompany him to Wilmington after they met in Waltham.  
            On July 19, police obtained warrants to search the defendant's apartment and digital storage devices located there, the vehicle he drove, his cell phone, and his cell phone records.  That evening, not yet having executed the search warrants, police ascertained the defendant's agreement to accompany them to the Lincoln police station to be questioned.  The defendant signed a form acknowledging his Miranda rights but refused to allow the police to record the interview.  
            During this evening interview on July 19, the defendant's account of the events changed again.  For the first time, the defendant told the police that, after he and the victim met at the restaurant, they drove together in the defendant's vehicle to a Woburn movie theater at the victim's direction.  There, the victim met with men in a Mercedes, and the defendant left the victim with the men and departed by himself.  The defendant admitted that he owed the victim $100,000, and that, contrary to his suggestion to the victim in the recorded telephone call, there was no check forthcoming for a sale of the victim's judgment.
            As this interview continued, police executed the search warrants.  In the defendant's apartment they found paper copies of e-mail messages from January 2013 relating to a request for a "quote" for a purchase of potassium cyanide.  In one of the messages, the telephone number listed for the "buyer" was the defendant's telephone number, and the would-be buyer's e-mail account was later determined to be one of the e-mail accounts associated with the defendant's cell phone.
            Partway through the interview, the detectives questioning the defendant were informed by the search team about the cyanide-related discovery.  The defendant thereafter admitted to having purchased potassium cyanide, claiming that the purchase was on behalf of the victim for use in a jewelry business.  The defendant eventually ended the interview himself after almost five hours, saying he was tired, and the detectives drove him home.  
            The following day, July 20, police again visited the defendant's apartment, seeking to obtain a key to the defendant's storage unit to execute a further search warrant they had obtained.  They found him severely injured, having cut his wrists and arms with a razor.  The defendant was taken by helicopter to Massachusetts General Hospital in Boston.  
            On the morning of July 21, two detectives went to the hospital to attempt to speak with the defendant and ask him about the location of the cyanide he had purchased; they had not found a cyanide container in any of their searches and were concerned about the danger to the public posed by any remainder.  The detectives found the defendant awake, in a sitting position in his hospital bed, with bandages on his hands and wrists.  He told police he was willing to speak with them.  He could not sign the Miranda form due to his bandaged injuries but stated that he understood his rights.  As with the interview on July 19, he insisted that the police not record the interview.  Upon being asked where the potassium cyanide was, the defendant responded that he had thrown it in a dumpster behind the building housing his storage unit.  He went on to tell the detectives that he had put cyanide potassium in the victim's coffee at the Waltham restaurant; that the victim thereafter died in the defendant's car; and that he had driven around with the victim's body for the rest of the day.  After twenty-five minutes, the defendant ended the interview, stating that his stomach hurt but suggesting that he would speak with the detectives again another time.
            The defendant underwent reconstructive surgery on his wrists on July 22.  The following morning, the detectives returned to interview the defendant again.  The defendant agreed to speak with them, again stated that he understood his Miranda rights, and again did not allow the detectives to record the interview.  The defendant then gave a more detailed account of the killing.  In sum, he described for the detectives how, after having purchased the cyanide, he arrived early to the appointed Waltham restaurant, purchased the two iced coffees, and mixed cyanide into the victim's drink before the victim arrived.  It took several hours for the victim to die, during which time the defendant drove to a number of places, including the Woburn movie theater he had previously mentioned.  Once it became dark, the defendant dragged the victim's body into the roadside woods where it was discovered.  
            Data from a global positioning system (GPS) device in the defendant's vehicle as well as other evidence traced the defendant's movements around the time of the killing.  The GPS data showed his vehicle departing his Sudbury home at 12:02 P.M. and stopping at a grocery store in Waltham at 12:28 P.M.  A receipt from the store showed that the defendant purchased a box of latex gloves at 12:31 P.M., and police found one of the gloves in the defendant's vehicle.  The GPS data showed the vehicle arriving at the Waltham restaurant at approximately 1 P.M.; remaining there until approximately 1:12 P.M.; being driven around the back of the block and stopping there; returning to the restaurant parking lot at around 1:20 P.M.; and remaining at the restaurant for approximately one-half hour.  In the defendant's apartment, police found a receipt from the restaurant for purchase of the coffees at 1:07 P.M.  The GPS data further showed that, after leaving the restaurant, the defendant's vehicle traveled in the vicinity of Waltham, Woburn, Winchester, and Lincoln for eight hours, twice passing by the location on Mill Street where the victim's body was discovered.  The vehicle returned to that location at 8:48 P.M. and remained there for three and one-half minutes before returning to the defendant's residence in Sudbury.  Cell site location information for the defendant's cell phone aligned with these travels on July 16 and also reflected his drive the following morning to Natick, where, as evidenced by video footage and a receipt, he had the vehicle professionally cleaned.
            Further evidence showed that, at the time of the killing, the defendant was thousands of dollars in debt to various people and had received an eviction notice for nonpayment of rent for his apartment the month before.  The victim was the defendant's largest creditor, and telephone calls between the two men recorded by the victim showed that the defendant was aware that the victim was angry at not being repaid the $100,000 he was owed.  A search of the defendant's computer turned up more than one hundred results for the term "cyanide."  These included a webpage accessed by the defendant that contained a detailed answer to the query, "Can I mix potassium or potassium cyanide in hot coffee or hot tea and drink it?  Will it work?" 
            b.  Prior proceedings.  The defendant was indicted on charges of murder in the first degree, G. L. c. 265, § 1; improper disposal of a body, G. L. c. 114, § 43M; and, in two counts, willfully misleading a police officer, G. L. c. 268, § 13B, for statements he made to police on July 18 and 19, 2013.[2]  
            Before trial, the defendant moved to suppress for lack of probable cause all fruits of the searches pursuant to the July 19, 2013 warrants to search his apartment, car, cell phone, and cell phone records.  Following a hearing, a judge denied the motion.
            The defendant also moved to suppress the statements he made to police from his hospital bed on July 21 and 23, 2013.  The defendant argued that his waivers of his Miranda rights were not voluntary, knowing, and intelligent, and that the statements themselves were not voluntary.  Following a seven-day evidentiary hearing, the same motion judge denied the motion.[3]
            At trial, the Commonwealth proceeded on theories of murder committed with deliberate premeditation and with extreme atrocity or cruelty.  The defendant's principal defense was that his confessions from his hospital bed following his suicide attempt and surgery were not voluntary, and that the other evidence against him was circumstantial, did not include physical forensic evidence directly linking him to the victim's body or crime scene, and did not amount to proof beyond a reasonable doubt.  To challenge the voluntariness of his statements, the defendant extracted acknowledgments from police witnesses that the defendant had not confessed to the murder in his statements prior to his hospitalization and, following his arrest upon discharge from the hospital, had not made any further statements during a lengthy car ride with the arresting officers and instead requested to speak with an attorney.  The defendant also presented testimony from two expert witnesses, who opined that, based on the defendant's medical condition and emotional state as well as the circumstances of each interview, he did not have the cognitive capacity to waive his Miranda rights or make statements voluntarily during either interview.  In rebuttal, the Commonwealth presented testimony from an expert witness that the defendant did have the capacity to waive his rights knowingly, intelligently, and voluntarily and to make voluntary statements at both interviews.  The judge instructed the jury that, in order to consider the statements as evidence, each juror would have to determine that the Commonwealth had proven beyond a reasonable doubt that the defendant made the statements voluntarily, freely, and rationally.  See Commonwealth v. Gallett, 481 Mass. 662, 668, 685-686 (2019). 
            The jury found the defendant guilty of murder in the first degree on the theory of deliberate premeditation and of the other charges.  The judge sentenced the defendant to life in prison for the murder conviction and concurrent sentences of from five to seven years on the two convictions of willfully misleading a police officer, and placed on file the conviction of unlawful disposal of a body.  Before us now is the defendant's direct appeal.[4]
            2.  Discussion.  We address in turn the defendant's arguments regarding two motions to suppress denied before trial.
            a.  Search warrants.  The defendant argues that the motion judge erred in denying his motion to suppress the evidence obtained from searches of his residence, vehicle, cell phone, and cell phone records, because the affidavit submitted by police in support of the warrants did not support a finding of probable cause for the searches.  We disagree.
            "Under both the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, a search warrant may issue only upon a showing of probable cause."  Commonwealth v. Long, 482 Mass. 804, 809 (2019).  Whether an affidavit supplied probable cause is a question of law that we review de novo.  Commonwealth v. Perkins, 478 Mass. 97, 102 (2017).  To show probable cause, the affidavit must establish that "the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief that an offense has been or is being committed" (citation and quotation omitted).  Commonwealth v. Stewart, 358 Mass. 747, 749 (1971).  The affidavit must also establish "a sufficient nexus 'between the suspected criminal activity, the items sought, and the place to be searched.'"  Commonwealth v. Dunn, 494 Mass. 42, 48 (2024), quoting Commonwealth v. Martinez, 476 Mass. 410, 416-417 (2017).  Such a finding of probable cause "does not require definitive proof of criminal activity"; rather, "[i]n dealing with probable cause . . . we deal with probabilities" (citations omitted).  Dunn, supra.  While "our review begins and ends with the four corners of the affidavit," we consider the affidavit "as a whole and in a commonsense and realistic fashion," and we may consider "[a]ll reasonable inferences which may be drawn from the information in the affidavit" (citations and quotation omitted).  Long, supra.
            The same detailed affidavit was submitted in support of all four challenged warrants.  The affidavit recounted the investigation that had occurred in the two days since the discovery in Lincoln of the victim's body, apparently dragged from the road into the woods and left without keys, identification, or a cell phone.  Approximately thirty minutes before the body was discovered, a construction worker had observed in the vicinity two "late [1990s] or early [2000s] model[]" vehicles "of Japanese manufacture":  a sedan and a station wagon, one vehicle green and the other gray, although the witness could not recall which was which.  The witness had seen one person standing between the vehicles but was unable to provide any description; the vehicles were fifteen to twenty yards away.  Police subsequently determined that the defendant drove a 2012 gray Toyota Corolla.  
            Once police identified the victim, they ascertained information that a gold medallion necklace imprinted with his last name that he usually wore was missing from his body, and that, while a preliminary screening blood test was positive for the presence of opiates, none of his prescribed medications contained opiates, and he did not use illegal drugs.  They further determined that he was wearing the same clothes he had been wearing the previous day, July 16, 2013, supporting a reasonable inference that he had died that day.  
            The police also learned that the victim and the defendant had spoken to each other on their respective cell phones twice on July 16, at 11:30 A.M. and 1:29 P.M.  The affidavit detailed the defendant's statements in two police interviews, including the defendant's admission that he had met with the victim at approximately 1:30 P.M. or 1:45 P.M. that day.  The victim's vehicle was then found parked at the same restaurant where the defendant said their meeting took place.        The affidavit identified a number of inconsistencies in the defendant's statements regarding his meeting with the victim.  In his initial in-person interview with the police, the defendant told police, among other details, that he and the victim met inside the Waltham restaurant over their iced coffees for about fifteen minutes, after which the defendant left, while the victim remained inside the restaurant.  However, when police later called the defendant from the restaurant's parking lot, the defendant revised his account.  This time, the defendant stated that he went alone into the restaurant to purchase the iced coffees; he and the victim began their meeting inside the victim's car; the defendant then began driving with the victim in the defendant's vehicle to an office supply store to purchase tape, until the victim requested that the defendant drive him back to the restaurant to attend another meeting; and the defendant thereafter dropped off the victim on the side of the restaurant's parking lot.
            The affidavit also described evidence that the defendant's accounts of the meeting not only were inconsistent in these respects, but also contained falsehoods.  The victim's recording of his call with the defendant on the morning of July 16 showed that the meeting occurred at the request of the defendant –- not, as the defendant had claimed to police, at the request of the victim.  The recording also contradicted the defendant's account of the meeting's purpose.  The defendant had told police that he and the victim had met to discuss a real estate venture in Dorchester and showed police a one-page "market analysis" of the Dorchester property, dated July 17, 2013.  By contrast, the recording reflected that the defendant had initiated the meeting to discuss two subjects that the defendant failed to mention to the police.  First, the defendant told the victim on the call, as paraphrased in the affidavit, that he "wanted to meet him that day because he had great news regarding his settlement"; he had spoken with "New York"; "the check was in the mail"; and "the victim should be getting the money soon."  Based on recordings of other calls between the two men as well as additional information gathered by investigators and recounted in the affidavit, these statements plainly referred to the defendant's attempts on the victim's behalf to sell the victim's $28 million judgment against Bulger.  Second, in the recording, the defendant spoke with the victim about an eleven-acre property available for investment in Wilmington.  During the call, the defendant obtained the victim's agreement to visit the Wilmington property with him that afternoon -- a plan the defendant had not mentioned to the police.
            The affidavit further recited that a search of a "real estate website" that "lists all available properties for sale" showed that no eleven-acre property, nor even a property half that size, was listed for sale in Wilmington.  The affidavit also reported that the defendant had previously been convicted of mail fraud in Federal court in Boston in 1994, as well as bank fraud and twelve counts of money laundering in a 1993 Federal case in Missouri.
            On the basis of these and other facts recited in the affidavit, police sought the four warrants the defendant challenges on appeal, stating they had probable cause to believe the defendant had committed attempted larceny by false pretenses and improper disposal of a body.  The resulting warrants authorized searches of the defendant's apartment for items including the victim's missing property, as well as paper and digital records pertaining to the defendant's relationship with the victim, their business dealings, and any other individuals with whom the defendant met on July 16 or 17; the defendant's cell phone and cell phone records, including records related to the same specified topics; and the vehicle driven by the defendant, for evidence including the victim's missing property, receipts relating to the purchases the defendant said he made over the course of the day on July 16, and forensic evidence.  The Commonwealth does not contest that probable cause for both attempted larceny by false pretenses and improper disposal of a body was required to support the full scope of these searches.  
            We agree with the motion judge that the facts recited in the affidavit, taken together with all reasonable inferences therefrom, see Long, 482 Mass. at 809, were "sufficient in themselves to warrant a [person] of reasonable caution in the belief that" these offenses had been committed (citation omitted), Stewart, 358 Mass. at 749, and, for each warrant, "that the items described in the warrant were related to the criminal activity and probably in the place[s] to be searched," Commonwealth v. Richardson, 479 Mass. 344, 351 (2018), quoting Commonwealth v. Canning, 471 Mass. 341, 348 (2015).  The defendant's two arguments to the contrary are unavailing.  
            The defendant first argues that the affidavit failed to provide a sufficient basis to conclude that criminal activity in the form of attempted larceny by false pretenses had occurred at all.  He emphasizes that certain facts in the affidavit -- such as that the victim and the defendant had discussed real estate ventures and the sale of the judgment -- merely established the existence of an economic relationship between them.  Cf. Commonwealth v. McCauliff, 461 Mass. 635, 638-639 (2012), quoting Commonwealth v. Mills, 436 Mass. 387, 396-397 (2002) ("The crime of larceny by false pretenses 'requires proof that [1] a false statement of fact was made; [2] the defendant knew or believed that the statement was false when he made it; [3] the defendant intended that the person to whom he made the false statement would rely on it; and [4] the person to whom the false statement was made did rely on it and, consequently, parted with property'" [footnote omitted]); Commonwealth v. LaBrie, 473 Mass. 754, 764 (2016) ("The elements of attempt . . . are [1] the specific intent to commit the substantive crime at issue, and [2] an overt act toward completion of the substantive crime").  He further argues that the fact of his prior convictions for financial crimes cannot transform his every economic relationship into attempted larceny.  
            We do not consider the parties' business relationship and the defendant's prior convictions in isolation, however, and instead consider the affidavit as a whole.  See Perkins, 478 Mass. at 102.  As discussed, the affidavit also recited, among other facts, that the defendant had told the victim that a large check was in the mail to him and had paired this news with an entreaty to participate in a new purported real estate investment opportunity in Wilmington.  Yet it appeared that no such eleven-acre parcel in Wilmington was listed for sale.  Moreover, the defendant's false and inconsistent statements to the police together gave rise to a reasonable inference that the defendant sought to conceal from them his statements to the victim regarding the supposed Wilmington investment opportunity in particular.  See Commonwealth v. Gentile, 437 Mass. 569, 574-575 (2002) (probable cause supported in part by defendant's "inconsistent, false, or implausible" statements to police).  The defendant falsely told the police that the victim had initiated the July 16 meeting; failed to mention the supposed Wilmington investment opportunity that the defendant had raised on the call as a reason to meet; failed to mention that he had obtained the victim's agreement to drive to Wilmington that afternoon; initially concealed before admitting that the victim indeed had been a passenger in his vehicle for at least a period of time that afternoon; and, when claiming that the meeting's purpose instead concerned the Dorchester real estate venture, showed the police a "market analysis" of the Dorchester property that was dated after his meeting with the victim.  Considered together and in light of the defendant's history of financial crimes, these facts established probable cause to search for evidence of attempted larceny by false pretenses.  See Dunn, 494 Mass. at 52 ("A defendant's prior criminal history may be helpful for establishing probable cause, particularly where the prior history involves a similar crime").  
            The defendant's second argument is that the affidavit did not establish probable cause to believe he was involved in the evident improper disposal of the victim's body.  See Matter of a Care & Protection Summons, 437 Mass. 224, 234 n.18 (2002), citing G. L. c. 114, §§ 43M, 43N (describing offense).  He emphasizes the vagueness of the construction worker's description of the two cars in the vicinity of the body and that, while the worker reported seeing a gray or green "late [1990s] or early [2000s]" model Japanese sedan, the defendant drove a more recent 2012 model gray Toyota Corolla.  
            In the context of the affidavit as a whole, this argument amounts to "hypercritical analysis" not precluding a finding of probable cause.  Dunn, 494 Mass. at 48, quoting Perkins, 478 Mass. at 102.  While the model year of the defendant's vehicle did not match the worker's estimate from fifteen to twenty yards away, the worker's observation was in other respects consistent with the defendant's vehicle and lent at least some support to a finding of probable cause that, importantly, was further supported by additional facts in the affidavit.  See Commonwealth v. Escalera, 462 Mass. 636, 644 (2012) (information insufficient to support inference nevertheless may do so where "coupled with other information").  These other facts included that the defendant met with the victim on the day he inferably died and at the same location where the victim's vehicle was later found; told the police that the victim had initiated their meeting, when in fact the defendant had initiated it; concealed the reasons he had used to induce the victim to meet; concealed that the victim had agreed to drive with him from the meeting to Wilmington; and initially concealed, before admitting, that the victim indeed was a passenger in the defendant's vehicle that afternoon.  While not definitive proof that the defendant was involved in the later roadside deposit of the victim's body, these facts together sufficed to establish probable cause.  See Dunn, 494 Mass. at 48; Gentile, 437 Mass. at 574-575. 
            We therefore conclude that the motion judge did not err in denying the motion to suppress.
            b.  Defendant's statements.  We next consider the defendant's claim that the statements he made to police from his hospital bed on the mornings of July 21 and July 23, 2013, should have been suppressed at trial because they were obtained in violation of his right against self-incrimination under the Fifth Amendment to the United States Constitution, as well as his due process rights guaranteed by the Fifth and Fourteenth Amendments and art. 12 of the Massachusetts Declaration of Rights.[5]  Following the seven-day evidentiary hearing on the defendant's motion to suppress, the judge concluded that the Commonwealth had met its burden to show that the defendant's waivers of his Miranda rights were voluntary, knowing, and intelligent, and that his statements were voluntary.  We agree with the judge's assessment.
            "Where . . . a defendant makes statements to police during a custodial interrogation, the Commonwealth bears the burden of proving, beyond a reasonable doubt, that the defendant's waiver of his or her Miranda rights was voluntary, knowing, and intelligent" (citation and quotation omitted).  Commonwealth v. Rivera, 482 Mass. 259, 265-266 (2019).[6]  "The Commonwealth must also show that any statement made after a waiver was voluntary, as a product of the defendant's 'rational intellect and free will.'"  Id. at 266, quoting Commonwealth v. Hoose, 467 Mass. 395, 403 (2014).  "Although we inquire separately into the voluntariness of the defendant's waiver of Miranda rights and the voluntariness of the statements, both inquiries require us to examine the totality of the circumstances surrounding the making of the statements to ensure that the defendant's will was not overborne."  Rivera, supra, quoting Hoose, supra.  "[A] defendant who is suffering from emotional or physical distress still may provide voluntary statements so long as he or she demonstrates an intelligent comprehension of his or her Miranda rights and of the circumstances."  Rivera, supra.  In reviewing the ruling below, "we accept the judge's subsidiary findings of fact absent clear error, and we defer to the judge's determination of the weight and credibility to be given to oral testimony presented at [the] motion hearing" (citation and quotation omitted).  Hoose, supra at 399.  "We conduct an independent review of the judge's application of constitutional principles to the facts found."  Id. at 400.  
            In thorough written findings, all supported by the record, the motion judge concluded that the defendant's waivers of his Miranda rights and his statements were voluntary.  The record before the judge included testimony from two forensic psychiatrists, called respectively by the Commonwealth and the defendant,[7] and from the two detectives who together conducted both interviews.  The judge found that, at each interview, the defendant told the detectives that he was well enough to speak with them, and there was "no indication that [the defendant] was unable to voluntarily waive his Miranda rights or make statements because of any physical, psychological, or drug-related impairment." 
            With respect to the interview on July 21 in particular, the judge found that the defendant was by then "in stable condition and, by agreement of both [psychiatrists], no longer under the influence of the morphine administered after he arrived at the hospital."  The judge found that the defendant "spoke calmly and responded to [the detective's] questions in a coherent and rational manner."  And the judge reasoned that the defendant's "refusal to have the interview recorded and his request to end the interview further demonstrate that he not only retained the capacity to make decisions, but that he was oriented and responsive."  
            Concerning the July 23 interview after the defendant's surgery, the judge found that, although the defendant was administered five milligrams of oxycodone shortly before the interview, the defendant's conduct demonstrated that "the drug did not diminish his mental functioning."  Rather, he was "alert throughout the interview and did not exhibit any confusion," and his responses to questions "demonstrated a full understanding of his circumstances and his right not to speak with the officers."  And the judge found that the defendant's refusal again to have the interview recorded further "demonstrated a rational understanding of his circumstances."  
            On appeal, the defendant does not claim clear error in any particular factual finding by the motion judge and instead argues that the record as a whole precludes the conclusion that the Commonwealth met its burden of proof beyond a reasonable doubt.  In sum, regarding the July 21 interview, the defendant emphasizes the recency of his serious suicide attempt and the physical effects thereof, including pain that he mentioned to the detectives.  His wrists in bandages and awaiting surgery, he was physically unable to sign the Miranda waiver, was prohibited from eating or drinking, and accepted the detectives' assistance in using a sponge to wet his lips.  Under the stress of his circumstances, he was in a "compromised and weakened state" that his expert opined made him "deferential to authority figures."  The July 23 interview, he emphasizes, followed less than a full day after the surgery on his wrists.  He remained physically unable to sign the Miranda waiver; had been administered oxycodone, a medication with side effects including disinhibition, delirium, and altered mental status; and received an additional dose afterward, suggesting, he argues, that he was in pain during the interview.[8]  
            Yet, as the motion judge correctly reasoned, "[t]he fact that a defendant may have been in a disturbed emotional state, or even suicidal, does not automatically make statements involuntary" (citation omitted), Rivera, 482 Mass. at 266, nor does the fact that "a defendant is suffering from a serious and painful injury," Commonwealth v. Bell, 473 Mass. 131, 141 (2015), cert. denied, 579 U.S. 906 (2016).  In light of the facts recited above and the entire record before the motion judge, we share his conclusion that the totality of the circumstances demonstrates that the defendant's waivers of his Miranda rights were voluntary, knowing, and intelligent, and that his statements were voluntary.  See Hoose, 467 Mass. at 403.  In short, the interviews each took place only after the defendant had been advised of and affirmed that he understood his Miranda rights.  Each time he also told the detectives he felt well enough to speak with them, and there is no evidence or even any suggestion that the detectives made promises or used any form of inducement to attempt to overcome the defendant's will.  See id.  The defendant then refused to allow the detectives to record either of the interviews; lucidly responded to their questions; and himself ended the first interview when he no longer wished to speak.  See id. (defendant's conduct relevant to voluntariness inquiry).  We therefore affirm the judge's denial of the motion to suppress.  
            c.  General Laws c. 278, § 33E.  We have reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E.  The defendant requests that we exercise our authority under the statute to order a new trial or reduce his conviction of murder in the first degree to a lesser degree of guilt.  We discern no basis to do so.
Judgments affirmed.
 
footnotes

 
            [1] In a private conversation during the lunch break in the Bulger trial proceedings on July 16, the victim was informed that he would not be called as a witness at the trial.  There was no public announcement that day about the decision.  
            [2] A nolle prosequi entered on an earlier indictment for attempted murder that had been returned by a grand jury before the medical examiner ruled on the victim's cause of death.
            [3] In the same motion, the defendant also sought suppression of statements he made at the police station on July 19 and in the hospital on the evening of July 23, and the motion was likewise denied as to these statements.  The defendant does not press any argument with respect to the July 19 statements in this appeal, and the statement from the evening of July 23 was not introduced at trial.
            [4] We previously affirmed the denial of the defendant's posttrial motion for deoxyribonucleic acid testing of the victim's shirt.  See Commonwealth v. Camuti, 493 Mass. 500, 501 (2024).
            [5] This motion also sought suppression of additional statements by the defendant, see note 3, supra, with respect to which the defendant's brief on appeal does not press any argument.  We therefore do not address them, but we have reviewed the entirety of the record pursuant to G. L. c. 278, § 33E.
            [6] We, like the motion judge, express no view on the question whether the interviews were custodial within the meaning of Miranda v. Arizona, 384 U.S. 436, 451 (1966), but assume for purposes of our decision that they were.
            [7] Although the experts did not have the benefit of recordings of the interviews in forming their opinions, they did review the detailed police report of the interviews.  One of the detectives had served as note taker while the other questioned the defendant, and the resulting report narrated the questions asked, and the defendant's answers in response, in a form resembling an informal transcript, with quotation marks used in a number of places to indicate direct quotations.
            [8] The defendant further emphasizes that he was later hospitalized in a psychiatric ward for eight days, during which time he received a failing score on one test of cognitive functioning.  The Commonwealth's expert testified that the defendant's score on the test, administered on July 24, 2013, was so low that it was consistent with dementia; represented a "f[a]ll off a cliff" by comparison with the other evidence regarding his condition; was likely invalid, possibly due to the impact of his physical inability to write; and should not be relied upon in the absence of a repeated test showing a similar result.  The defendant's expert placed greater weight on the score but agreed that it was consistent with conditions such as dementia.  While the motion judge did not make an express factual finding regarding whether this test score held any significance, the record as a whole amply supports his conclusion that the defendant had the capacity at the time of the interviews to waive his rights and give statements voluntarily.